IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ian Thomas Branham, | No. CV-10-501-PHX-ROS (LOA) |
| Petitioner, | **REPORT AND RECOMMENDATION** |
| vs. | |
| John Gay, et al. | |
| Respondents. | |

This matter is before the Court on Petitioner's Petition for Writ of Habeas Corpus. (Doc.1)  Respondents have filed an Answer, doc., 12, to which Petitioner has replied, doc. 16.   After considering the briefing, exhibits, and relevant law, it is recommended that the Petition be denied.

**I. Factual and Procedural Background**

   **A.  Charges, Trial and Sentencing**

      On June 23, 2003, the State of Arizona filed an indictment in the Arizona Superior Court, Maricopa County, charging Petitioner with several crimes against the same victim, Francesca A: (1) five counts of sexual assault (Counts IX, X, XIII, XIV, and XV); and one count of kidnapping (Count XVI).[1]  (Respondents' Exh. A, item 2)   At a pretrial conference,

_____

[1]  The State also charged William (a.k.a. Billy) Watson, Rita Anthony, Keoni Watson, Andre Hamilton, and Guy Wooten with committing additional crimes against Francesa A. (Respondents' Exh. A, item 2)  Pursuant to cooperation plea agreements, Rita Anthony, Keoni Watson, and Guy Wooten testified against Petitioner who was tried alone.  (Respondents' Exh.

1    the trial court[2] renumbered Counts X, XIII, XIV, and XVI, as Counts I, II, III, IV, and V,

2    respectively.  (Respondents' Exh. B, item 108; Exh. D, Tr. 4/8/05 at 3-6)   Counts I and IV

3    alleged that Petitioner had vaginal sexual intercourse with Francesca without her consent.

4    (Respondents' Exh. F at Tr. 4/12/05 at 10-11)   Counts II and III charged Petitioner as an

5    accomplice to non-consensual vaginal sexual assaults against Francesca, committed by Guy

6    Wooten and Keoni Watson, respectively.  (*Id*.)

7         The charges were based on the following events.  The victim, Francesca, traveled to

8    Tempe, Arizona in early June 2003 to visit a friend.  (Respondents' Exh. G, Tr. 4/13/05 at

9    47-52)   Francesca, her friend, and his roommates visited Mill Avenue twice.  (*Id*. at 55)

10   On Monday June 9, 2003, Francesca visited Mill Avenue alone.  (*Id*. at 55-56)  Francesca

11   recognized "Jake" and his friends from her prior visits to Mill Avenue, and joined them for

12   the afternoon.  (Respondents' Exh. G, Tr. 4/13/2005 at 56-58)  While at a nearby park,

13   Francesca bought LSD from a couple who invited her and Jake to a party.  (Respondents'

14   Exh. G, Tr. 4/13/2005 at 57-59, 116-118)   After taking the LSD, Francesca, who was

15   disoriented, followed the couple and Jake to 1129 South Stratton Avenue, a reputed drug

16   house.  (*Id*. at 61; Exh. F, Tr. 4/12/05 at 75, 79, 81, 85)

17        Billy Watson resided at the house along with several others.  (Respondents' Exh. F,

18   Tr. 4/12/05 at 75-76, 95-96)  Billy slept in the northeast bedroom, which he secured with a

19   double dead-bolt to which only he had a key.  (*Id*.  at 95-96; Exh. O, Tr. 5/2/05 at 8-9, 32)

20   Billy's girlfriend, Rita Anthony, frequently visited the residence.  (Respondents' Exh. F, Tr.

21   4/12/05 at 72-78)   Billy's drug clientele included four men who shared an apartment in

22   Mesa - Guy Wooten ("Woo"), Damien King ("ATL"), Andre Hamilton ("Dre"), and

23   Petitioner ("T", "T-Dog", "T-Loc", and "L.J.").  (Respondents' Exh. H, Tr. 4/14/05 at 15-

24

25

26   F, Tr. 4/12/05 at 82-84; Exh. H., Tr. 4/14/05 at 14-16, 29-30; Exh. K, Tr. 4/21/05 at 97-98)

27        [2]  The Honorable Brian K. Ishikawa presided over Petitioner's pre-trial, trial, sentencing, and

28   post-conviction proceedings in the Arizona Superior Court.

24, 81-82; Exh. K, Tr. 4/21/05 at 88-95, 109; Exh. L, Tr. 4/25/05 at 32; Exh. Q, Tr. 5/4/05 at 19, 56)

Rita and Keoni saw Francesca and Jake shortly after they arrived at Billy's house. (Respondents' Exh. F, Tr. 4/12/05 at 84-85; Exh. K, Tr. 4/21/05 at 103)   Rita observed Francesca "hanging out" with Billy, holding a marijuana pipe.  (Respondents' Exh. F, Tr. 4/12/05 at 81, 84-85)   Rita left the house at 11:00 p.m.  (*Id.* at 86; Exh. G, Tr. 4/13/05 at 62) Francesca later went into Billy's bedroom, and was alone with Billy who locked the door. (Respondents' Exh. G, Tr. 4/13/05 at 62)  Billy threatened Francesca with violence, and forced her to perform oral sex on him.  (Respondents' Exh. G, Tr. 4/13/05 at 63, 71)

At around 1:00 a.m., on June 10, 2003, Rita returned to Billy's house, found his bedroom door locked, and waited for him to join her in the living room.  (Respondents' Exh. F, Tr. 4/12/05 at 96-97)   Billy opened his bedroom door and called Rita into his room. (Respondents' Exh. F, Tr. 4/12/05 at 97-98; Exh. G, Tr. 4/13/05 at 63)  When she entered the bedroom, Rita heard Billy lock the door, and saw Francesca partially naked, quiet, and unresponsive.  (Respondents' Exh. F, Tr. 4/12/05 at 98-99; Exh. G, Tr. 4/13/05 at 63) Throughout the early morning hours, Billy forced Francesca to engage in sexual acts, beat her, hit her with a golf club, cut her with a razor, gave her drugs, and Rita and Billy tied Francesca up with an electrical cord.  (Respondents' Exh. F, Tr. 4/12/05 at 100-11; Exh. G, Tr. 4/13/05 at 68)   At some point, Francesca's friend Jake left the house.  (*Id.* at 63)

At approximately 6:00 a.m., Billy telephoned the residence of Petitioner, King, Wooten, and Hamilton and invited them to his house to pick up some marijuana. (Respondents' Exh. H, Tr. 4/14/05 at 34-35, 37)  Wooten drove himself, Petitioner, Hamilton, and King to Billy's house.  (Respondents' Exh. F, Tr. 4/12/05 at 16, 163; Exh. G, Tr. 4/13/05 at 37; Exh. H, Tr. 4/14/05 at 34-35)   When the four men arrived, Billy let them into his bedroom and Rita left the room.  (Respondents' Exh. F, Tr. 4/12/05 at 113-120, 159-60; Exh. G, Tr. 4/13/05 at 36-37, 44; Exh. H, Tr. 4/14/05 at 34-35; Exh. P., Tr. 5/3/05 at 98, 102-05)

1   When they entered the bedroom, Petitioner and the three men saw Francesca naked

2   on the bed with bruises and lash marks on her legs, and abrasions.  (Respondents' Exh. H,

3   Tr. 4/14/05 at 36-39, 50)   Francesca perceived the men enter the room, but was unable to

4   observe their appearance before losing consciousness.  (Respondents' Exh. G, Tr. 4/13/05 at

5   85)   Billy told Petitioner and the others he had given Francesca five "hits" of LSD.

6   (Respondents' Exh. H, Tr. 4/14/05 at 138-40)   Billy whipped Francesca with a belt and told

7   Petitioner, Wooten, Hamilton, and King that he "wanted [them] all to gang bang

8   [Francesca]."  (*Id.* at 43)

9   After obtaining condoms, the four men took turns having vaginal intercourse with

10   Francesca, and watched each other's activities.  (Respondents' Exh. H, Tr. 4/14/05 at 46-48,

11   93-94; Exh. Q, Tr. 5/4/05 at 63)   Rita, who was standing outside the room, heard Francesca

12   "moaning," "slapping noises," and other "gross" sounds.   Rita concluded that the men were

13   raping Francesca.  (Respondents' Exh. F, Tr. 4/12/05 at 120; Exh. G, Tr. 4/13/05 at 24, 36-

14   37)

15   After Petitioner, Wooten, Hamilton, and King had non-consensual sex with

16   Francesca, Billy did the same and called his brother, Keoni, into the room to watch.

17   (Respondents' Exh. K, Tr. 4/21/05 at 108-09, 172)   Meanwhile, Rita saw Petitioner,

18   Wooten, Hamilton, and King return to their car and leave.  (Respondents' Exh. F, Tr.

19   4/12/05 at 120, 163; Exh. H, 4/14/05 at 51)

20   At around 8:00 a.m. that morning, Austin Del Castillo, who had arrived at the house a

21   few hours earlier, saw Francesca wander into the living room and heard her babble

22   incoherently, like she "was drugged."  (Respondents' Exh. O, Tr. 5/2/05 at 15-18, 135)

23   Austin noticed that Francesca's face and body were covered with semen; she was nearly

24   naked, and had numerous fresh bruises, a black eye, bite marks on her neck, and lash marks

25   on her arms and legs.  (*Id.* at 16-17)   Billy then took Francesca, who still appeared

26   disoriented, to the bathroom and Austin helped her take a shower.  (Respondents' Exh. O,

27   Tr. 5/2/05 at 18-19)   Billy and Rita found Francesca's ATM card in her clothing and Billy

28   sent Rita to use the ATM card to withdraw money.  (Respondents' Exh. F, Tr. 4/12/05 at

126-27; Exh. L, Tr. 4/25/05 at 99-100)   Austin tried to convince Francesca to leave, but she would not go without her ATM card.  (Respondents' Exh. F, Tr. 4.12.05 at 28; Exh. G, Tr. 4/13/05 at 86-87; Exh. O, Tr. 5/2/05 at 21)

Throughout the day, Billy continued to beat Francesca, gave her more drugs, and threatened another "gang bang."  (Respondents' Exh. G, Tr. 4/13/05 at 89)  For the second time that day, Billy called Petitioner's apartment to summon Petitioner, Wooten, and Hamilton to his house.  (Respondents' Exh. H, Tr. 4/14/05 at 54-56)   Billy also sent Rita and Keoni to pick up two female friends, Jamie Dix and Vanessa Gregg.  (Respondents' Exh. F, Tr. 4/12/05 at 128; Exh. J, Tr. 4/20/05 at 41-42, 103; Exh. K, Tr. 4/21/05 at 117-19) Petitioner, Wooten, and Hamilton arrived at Billy's residence while Austin was playing a videogame in the living room.  (Respondents' Exh. H, Tr. 4/14/05 at 56-58, 60; Exh. J, Tr. 4/20/05 at 49-51, 106-08; Exh. K, Tr. 4/21/05 at 120-21; Exh. Q, Tr. 5/4/05 at 66)   While Francesca was wandering around the house naked, Wooten noticed that she appeared to have more injuries since the morning and she was acting "skittish" and saying things like "I don't know what I'm doing," "Oh, my god."  (Respondents' Exh. H, Tr. 4/14/05 at 55-56)

When Keoni, Vanessa, and Jamie arrived, Billy left the house.  (Respondents' Exh. J, Tr. 4/20/05 at 43, 104-07; Exh. K, Tr. 4/21/05 at 119) When Keoni, Vanessa, and Jamie entered Billy's bedroom, they saw Petitioner, Wooten, and Hamilton sitting around Francesca who was sitting on a stool in the corner, appeared disoriented, wearing only thong underwear, and with bruises on her face and whip marks on her legs.  (Respondents' Exh. J, Tr. 4/20/05 at 43-44, 106-110; Exh. K, Tr. 4/21/05 at 119-21; Exh. L, Tr. 4/25/05 at 62, 69-71).  When Jamie and Vanessa asked Francesca if she wanted to leave, she again refused to leave the house without her ATM card.  (Respondents' Exh. J, Tr. 4/20/05 at 43-44, 48, 62; Exh. H, Tr. 4/14/05 at 61)

A short time later, Francesca, Vanessa, Jamie, and Petitioner left Billy's bedroom and went to the living room.  (Respondents' Exh. H, Tr. 4/14/05 at 60-61)   Before leaving the house with Jamie, Vanessa saw Petitioner walk down the hallway towards Billy's bedroom.  A short while later, Francesca returned to Billy's bedroom, where Petitioner,

Wooten, and Hamilton were talking.  (Respondents' Exh. H, Tr. 4/14/05 at 61-63)   Keoni entered the bedroom and saw Wooten and Hamilton "kissing on" and "feeling up" Francesca, who "seemed incoherent," while she was standing next to the bed where Petitioner was seated.  (Respondents' Exh. H, Tr. 4/14/05 at 63; Exh. K, Tr. 4/21/05 at 123-24)  Keoni then hit Francesca several times.   Petitioner grabbed Francesca by the hair and "elbowed her in the face," causing her to go "limp" and fall back onto the bed where she remained motionless for a minute.  Keoni "thought she was dead."  (Respondents' Exh. H, Tr. 4/14/05 at 63, 64; Exh. K, Tr. 4/21/05 at 124-25, 128; Exh. L, Tr. 4/25/05 at 17)

Francesca, aware that three or four men were in the room, overheard Petitioner, Wooten, Hamilton, and Keoni talking about her.  (Respondents' Exh. G, Tr. 4/13/05 at 91-93)   When Francesca began to move, Hamilton grabbed her hands and held them over her head, Petitioner and Wooten held her legs open, and Keoni vaginally raped Francesca while she fought and screamed.  (*Id.* at 92-93; Exh. H, Tr. 4/14/05 at 70; Exh. K, Tr., 4/21/05 at 124-25, 129-30)  Petitioner continued to hold one of Francesca's legs and laughed while Keoni sexually assaulted her.  (Respondents' Exh. K, Tr. 4/21/05 at 125)

In the meantime, Vanessa and Jamie knocked on the bedroom door because Vanessa had left her purse inside.  (Respondents' Exh. J, Tr. 4/20/05 at 61, 113-114; Exh. L, Tr. 4/25/05 at 72)   When someone cracked the door to hand Vanessa her purse, she was Keoni pulling down Francesca's shirt.  (Respondents' Exh. J, Tr. 4/20/05 at 114-115, 117–19; Exh. L, Tr. 4/25/05 at 72)  Vanessa and Jamie left the house, but did not call police. (Respondents' Exh. J, Tr. 4/20/05 at 51, 119-20)

A short time later, Austin knocked on Billy's bedroom door, and Keoni let him in. (Respondents' Exh. H, Tr. 4/14/05 at 67; Exh. K, Tr. 4/21/05 at 128-129)   Keoni locked the door, then put a pillow on Francesca's face, and sat on her chest.  (Respondents' Exh. K, Tr. 4/21/05 at 126; Exh. O, Tr. 5/2/05 at 36-38)  Wooten then had vaginal intercourse with Francesca while Petitioner and Hamilton held her legs.  (Respondents' Exh. G, Tr. 4/13/05 at 92-95; Exh. H, Tr. 4/14/05 at 67-69; Exh. K, Tr. 4/21/05 at 126-28; Exh. O, Tr. 5/2/05 at

1   36-38, 119-120; Exh. Q, Tr. 5/4/05 at 16)   Francesca was aware the men "were having sex

2   with" her, but did know which men were doing so.  (Respondents' Exh. G, Tr. 4/13/05 at 93)

3          After Wooten finished sexually assaulting Francesca, Austin saw Petitioner approach

4   Francesca, who was then wandering around the bedroom, elbow her in the head, and knock

5   her onto the bed.  (Respondents' Exh. O, Tr. 5/2/05 at 39-40)   Petitioner then started hitting

6   Francesca in the ribs and stomach, drug her into the bathroom, pushed her head down into

7   the bathtub, and raped her while she was "screaming" and "fighting."  While doing so,

8   Petitioner hit and strangled Francesca to control her.  Wooten, Keoni, Austin, and Hamilton

9   watched from outside the bathroom.  (Respondents' Exh. G, Tr. 4/13/05 at 98, 126, 133,

10  139-140; Exh. H, Tr. 4/14/05 at 72-74, 134-36, 147-48; Exh. K, Tr. 4/21/05 at 129-34; Exh.

11  L, Tr. 4/25/05 at 26, 38; Exh. O, Tr. 5/2/05 at 40-43, 51-52; Exh. P, Tr. 5/3/05 at 60-63, 108-

12  11; Exh. Q, Tr. 5/4/05 at 14-16, 63-66, 71)   Petitioner left Francesca on the bathroom floor.

13  (Respondents' Exh. H, Tr. 4/14/05 at 74)

14         Shortly thereafter, Billy returned home.  (*Id.* at 77)   When Petitioner, Hamilton, and

15  Wooten left the house Tuesday night, Keoni found Francesca lying on a bed and mumbling

16  "I just want to sleep."  (Respondents' Exh. K, Tr. 4/21/05 at 138-39)

17         When Rita returned to Billy's house on the morning of June 11, 2003, she found

18  Francesca badly bruised.  (Respondents' Exh. F, Tr. 4/12/05 at 133-34; Exh. O, Tr. 5/2/05 at

19  45)   At around 3:00 p.m., Rita and Billy left the house.  (Respondents' Exh. F, Tr. 4/12/05

20  at 134-35)   Austin dressed Francesca, carried her to his car, and they drove away from the

21  house.  (Respondents' Exh. F, Tr. 4/12/05 at 135-36; Exh. G, Tr. 4/13/05 at 100-01; Exh. K,

22  Tr. 4/21/05 at 140; Exh. O, Tr. 5/2/05 at 45-46)

23         When Billy and Rita returned home and Francesca was gone, they packed, loaded the

24  car, and fled.  (Respondents' Exh. F, Tr. 4/12/05 at 135-37; Exh. K, Tr. 4/21/05 at 140) Billy

25  plucked his eyebrows and shaved his hair, which he had worn in a ponytail.  (Respondents'

26  Exh. F, Tr. 4/12/05 at 122-23; Exh. H, Tr. 4/14/05 at 24-25; Exh. K, Tr. 4/21/05 at 88)

27         At around 8:15 p.m., Austin drove Francesca to the Tempe Police Department.

28  (Respondents' Exh. F, TR. 4/12/05 at 52, 54, 65; Exh. O, Tr. 5/2/05 at 46-47)   Officer

Berumdez found Francesca in Austin's car "almost lifeless," "limp," and with multiple contusions on her face and body.  (Respondents' Exh. F, Tr. 4/12/05 at 54-57)   Officer Bermudez photographed Francesca's injuries, she was too weak to be interviewed. (Respondents' Exh. F, Tr. 4/12/05 at 57-60, 62)

Francesca was transported to Scottsdale Osborn Hospital and treated by emergency physician, Dr. Vasquez at 8:48 p.m.  He observed that she was badly beaten, and later confirmed that her right eye had an orbital fracture.  (Respondents' Exh. H, Tr. 4/14/05 at 151-57, 160)

In the meantime, Detective Ball interviewed Austin at the Tempe police station. (Respondents' Exh. P, Tr. 5/3/05 at 89-91; 106-09)   At around 10:20 p.m., Forensic Nurse Examiner Kreiner, began an examination which took nearly three hours because Francesca had 33 distinct injuries to document.  (Respondents' Exh. K, Tr. 4/21/05 at 13-44) Subsequent test results revealed the presence of amphetamine, methamphetamine, several depressants (Xanax, Methorphan, and Lorazepam), and the metabolites of marijuana and cocaine.  (Respondents' Exh.  I, Tr. 4/19/05 at 4-10; Exh. K, Tr. 4/21/05 at 24-25)

On June 12 and 13, 2003, Sergeant Stadel interviewed Francesca at the hospital. (Respondents' Exh. I, Tr. 4/19/05 at 92-95)   Francesca described the person who had lashed her legs as "[t]all," "[kind of] dark-skinned, not a lot of hair on his body, long [dark, wavy] hair, dark eyes, [and] tattoos on his body."  (*Id*. at 99-100)   Although Francesca's description matched Billy's appearance, she could not identify him from a photographic lineup.  (*Id*. at 101-02)   Francesca described the other men as "black guys," and later elaborated that the man who sexually assaulted her in the bathroom was "pretty built" and "strong" had "long hair [in] cornrows going back," and was approximately 25 years old and stood approximately 6'4" tall.  (*Id*. at 114-116)   Francesca never described the bathroom attacker as having an arm cast.  (*Id*. at 116)

Police obtained a search warrant for Billy's house.  (Respondents' Exh. I, Tr. 4/19/05 at 102-03; Exh. P, Tr. 5/3/05 at 95, 132)   Police found a golf club, a discarded Lifestyles condom wrapper, woman's clothes, a pill packet containing a Lorezepam tablet, a bag of

marijuana, an electrical cord, and loose ammunition.  (Respondents' Exh. I, Tr. 4/19/05 at 83-86, 103-08; Exh. L, Tr. 4/25/05 at 43-56, 119-23)   The police did not find used condoms, or biological fluids in the bedroom.  (Respondents' Exh. I, Tr. 4/19/05 at 105, 108, 121-122)   None of the seized items contained the DNA of Francesca, Petitioner, Wooten, Hamilton, King, or Keoni.  (*Id*. at 57-58, 63; Exh. L, Tr. 4/25/05 at 113, 122-23, 133, 138-39)

On June 13, 2003, Detective Shumaker showed Austin five different photographic lineups.  (Respondents' Exh. X, State's photographic trial exhibits 71-75; Respondents' Exh. P, Tr. 5/3/05 at 140-47)  Austin identified Wooten and Rita from two photographic lineups.  (*Id*. at 140-41, 145-47)

That same day, Detective Culp visited Francesca at the hospital to show her six photo-lineups.  (*Id*. at 26-32)   Francesca, who appeared "muddled" and "injured," did not identify anyone from the lineups containing pictures of Smith, King and, Trumbull; however, she identified Rita, Wooten, and Keoni in three different photo arrays.  (*Id*. at 28-32, 41-47)

On June 14, 2003, the police arrested Billy, Keoni, and Rita.  (Respondents' Exh. J, Tr. 4/20/05 at 64-65; Exh. K, Tr. 4/21/05 at 142, Exh. P, Tr. 5/3/05 at 138, 147; Exh. F, Tr. 4/12/05 at 136-38; Exh. G, Tr. 4/13/05 at 15)  Inside Rita's purse and Billy's bags, police found a small scale, glass pipe, marijuana, morphine, Lorezepam, methamphetamine, and several anti-depressants.  (Respondents' Exh. J, Tr. 4/20/05 at 88-98; Exh. P, Tr. 5/3/05 at 10-24)

During her interview with police, Rita reported seeing "four black men" arrive at Billy's house on the morning of June 10, 2003.  (Respondents' Exh. P, Tr. 5/3/05 at 98)  Rita positively identified King from a photo-lineup.  (*Id*. at 99-102, 119)  Rita indicated that Wooten's picture looked familiar, and later explained that fear of reprisal made her afraid to positively identify Wooten.  (*Id*. at 103-04; Exh. G, Tr. 4/13/05 at 34-35)

That same day, Detective Shumaker interviewed Keoni and showed him three photo-lineups containing pictures of Wooten, King, and Trumbull.  (Respondents' Exh. P, Tr.

5/3/05 at 148-51)   Keoni positively identified Wooten, but did not identify King or

Trumbull.  (*Id.*)   Keoni described the person he called "T" as being either a "light-skinned

African-American," a Mexican, or a Spaniard.  (*Id.* at 153)   Keoni consistently told

Shumaker that "T" was the person who raped Francesca in the bathroom, and "Woo" had a

cast on his arm and raped Francesca in the bedroom.  (*Id.* at 154)

        Also on June 14, 2003, Detective Johnson interviewed Jamie Dix about her

observations at Billy's house on Tuesday night.   (Respondents' Exh. J, Tr. 4/20/05 at 41-42;

Exh. L, Tr. 4/25/05 at 60)   Jamie reported that: (1) she and Vanessa arrived around 9:00

p.m. and left at 10:30 p.m.; (2) inside Billy's bedroom, she saw Francesca with "four black

guys," one of whom "wasn't totally black," but "real light skinned;"(3) these men were

sitting around Francesca, who was on the bed; (4) Francesca spoke in a "really tiny voice"

and was on "cloud nine"; and (5) Francesca wouldn't leave without her ATM card.

(Respondents' Exh. J, Tr. 4/20/05 at 45-48; 57, 62, 66; Exh. L, TR. 4/25/05 at 60-62)

Detective Johnson showed Jamie three photo-lineups containing pictures of Wooten, King,

and a person unrelated to the case.  (Respondents' Exh. L, Tr. 5/25/05 at 66-68)   Jamie

indicated that Wooten might be "the guy."  (*Id.* at 67; Exh. J, Tr. 4/20/05 at 53-54)

        Although Vanessa Gregg initially denied knowledge on the incident, (Respondents'

Exh. J, Tr. 4/20/05 at 115-116; Exh. L, Tr. 4/25/05 at 68), when Detective Johnson

interviewed her on June 26, 2003, she provided the following information: (1) when she

entered Billy's bedroom on Tuesday night, she saw three men, whom she described as "two

darker skinned black males, one of which was smaller, and the other one was tall and skinny

and had a cast on his arm, and . . . there was a lighter-skinned black male [who] had like

breadties in his hair that went around the side"; (2) she talked to the lighter-skinned man in

the living room; (3) she was unable to retrieve her purse from Billy's bedroom because the

door was locked; and (4) when someone cracked the door to return her purse, Vanessa saw

Keoni pulling Francesca's shirt down.  (Respondents' Exh. J, Tr. 4/20/05 at 115-17, 127-28;

Exh. L, Tr. 4/25/05 at 68-71, 97-98; Exh. R, Tr. 5/9/05 at 72-75, 78, 80)

1      Detective Johnson showed Vanessa four photo-lineups containing pictures of

2  Wooten, Petitioner, King, and Hamilton.  (Respondents' Exh. J, Tr. 4/20/05 at 121-23; Exh.

3  L, Tr. 4/25/05 at 72-76; Exh. R, Tr. 5/9/05 at 79-80)   Vanessa identified Petitioner as "the

4  guy that I was talking to," and identified Hamilton as "the smaller of the two dark guys."

5  (Respondents' Exh. J, Tr. 4/20/05 at 122-23; Exh. L, Tr. 4/25/05 at 75-76, 95)    Although

6  Vanessa did not identify Wooten, she reported seeing another dark-skinned man with a cast

7  inside Billy's bedroom.  (Respondents' Exh. L, Tr. 4/25/05 at 96-97)

8      On June 18, 2003, police arrested Wooten, who consented to an interview with

9  Detective Shumaker.  (Respondents' Exh. P, Tr. 5/3/05 at 158; Exh. Q, Tr. 5/4/05 at 2-3)

10  Wooten initially stated that he, Petitioner, Hamilton, and King went to Billy's house on

11  Tuesday morning, but contended that only Billy had raped Francesca.  (Respondents' Exh.

12  P, Tr. 5/3/05 at 158-59; Exh. Q, Tr. 5/4/05 at 3)    Wooten acknowledged that Francesca

13  appeared drugged and that he saw belt marks on her legs.  (Respondents' Exh. Q, Tr. 5/4/05

14  at 4-5)  Wooten stated that he saw Petitioner elbow or slap Francesca in the face, and that he

15  heard Francesca screaming when she was in the bathroom with Petitioner.  (*Id*. at 3-4; Exh.

16  H, Tr. 4/14/05 at 147-48)

17      Later that same day, police arrested King and Hamilton.  (Respondents' Exh. P, Tr.

18  5/3/05 at 158; Exh. Q, Tr. 5/4/05 at 2, 5-6)

19      Based on information obtained from Wooten, Hamilton, and King's post-arrest

20  interviews, the police identified and arrested Petitioner that night.   (Respondents' Exh. P,

21  Tr. 5/3/05 at 158-59; Exh. Q, Tr. 5/4/05 at 2-3)   At approximately 11:00 p.m., Detective

22  Hayes presented Austin another photo-lineup which contained Petitioner's picture.

23  (Respondents' Exh. P, Tr. 5/3/05, at 59-63; Exh. Q, Tr. 5/4/05 at 7-8)  Austin pointed at

24  Petitioner's picture and stated, "That's ATL.  That's ATL or Woo.  I seen (sic) him there.

25  I'd seen (sic) him raping her."  (Respondents' Exh. P, Tr. 5/3/05 at 62-63, 75, 82)  Austin

26  told detectives that Petitioner was one of the three men who raped Francesca with Keoni at

27  Billy's house.  (*Id*. at 63, 76, 81-82)

28

1       Detective Shumaker subsequently presented Austin with individual photographs,

2   each depicting a single person.  (Respondents' Exh. Q, Tr. 5/4/05 at 11-16)   Austin

3   identified Billy, Rita, Keoni, Hamilton, and Petitioner.   Austin identified Petitioner as the

4   man who raped Francesca in the bathroom and held Francesca's leg while another man

5   raped her in the bedroom.  Austin identified Wooten as the man who raped Francesca in the

6   bedroom while the other two men held her legs.  (Respondents' Exh. Q, Tr. 5/4/05 at 11-16;

7   Exhibit X, State's photographic trial exhibits 81, 82, 83, 84, 85, 86, 86, 88, 89)

8       During a three-day preliminary hearing and subsequent trial, Austin consistently

9   identified Petitioner in court as the "light-skinned" and "fat" man with braided hair who had

10  raped Francesca inside the bathroom on Tuesday afternoon.  Austin referred to Petitioner as

11  "ATL," because they had never been formally introduced.  (Respondents' Exh. H, Tr.

12  4/14/05 at 135; Exh. O, Tr. 5/2/05 at 129-30, 133; Exh. P., Tr. 5/3/05 at 108-11; Exh. Q, Tr.

13  5/4/05 at 71, 75, 77, 81-83, 86-90)   Austin also consistently identified Wooten in court as

14  the person he saw raping Francesca in the bedroom.  (Respondents' Exh. P, Tr. 5/3/05 at

15  109)   Although Austin did not know Petitioner's and Wooten's correct names, he

16  consistently identified them by their conduct during his police interview and in-court

17  testimony.  (*Id*. at 110-11; Exh. Q, Tr. 5/4/05 at 9-16)

18     **B.  Verdicts and Sentence**s

19      At the conclusion of trial, the jury convicted Petitioner of all five counts, as charged.

20  (Respondents' Exh. A, Items 146-50; Exh. T, Tr. 5/11/05 at 3-11)  The jury later found three

21  aggravating factors: (1) the offense involved accomplices; (2) the offense was especially

22  heinous, cruel, and depraved; and (3) Petitioner caused physical and emotional harm to the

23  victim.  (Respondents' Exh. A, Items 156-60; Exh. U, Tr. 5/12/05 at 68-79)   Petitioner

24  subsequently admitted a historical prior felony conviction for armed robbery.  (Respondents'

25  Exh. B, Item 166; Exh. V, Tr. 5/23/05 at 3-13)  The trial court found no mitigating

26  circumstances.  (Respondents' Exh. W, Tr. 6/17/05 at 50)  The trial court imposed four

27  consecutive, aggravated, 21-year prison terms for Petitioner's sexual assault convictions

28  (Counts I-IV).  (Respondents' Exh. W, Tr. 6/17/05 at 50-51)   The trial court imposed an

1  aggravated prison term of 18.5 years for Petitioner's kidnapping conviction (Count V), to

2  run concurrently with the sentence on Count I.  (Respondents' Exh. B, Item 167; Exh. W,

3  Tr. 6/17/05 at 51-52)

4  **C.  Direct Appeal**

5  On July 6, 2005, Petitioner filed a timely notice of direct appeal.  (Respondents' Exh.

6  A, Item 177)   On June 5, 2006, Petitioner, through counsel Thomas Gorman, filed an

7  opening brief raising the following issues:

8  1.  Petitioner "was deprived of his right to a fair trial and to present a defense
   under the Sixth and Fourteenth Amendments, U.S. Constitution, when the trial
9  court refused to permit him to present probative evidence and argument relevant
   to his misidentification defense regarding an uncharged assailant named Damian
10 King."  (Respondents' Exh. Y, at 10-15)

11 2.  "The trial court abused its discretion by permitting the State to repeatedly
   elicit evidence and argument terming the incident a 'gang bang' and 'gang
12 rape.'"  (*Id.* at 15-17)

13 3.  Petitioner "was deprived of his rights to a fair trial, compulsory process and
   to present exculpatory evidence under the Sixth and Fourteenth Amendments, U.S.
14 Constitution, when the trial court refused to permit [Petitioner] to call Hamilton
   to be viewed by the jury or to declare a mistrial or impose other appropriate
15 sanctions against the State for its misconduct which resulted in the loss of a
   prospective witness and codefendant Andre Hamilton's testimony at trial after
16 he invoked his privilege to remain silent."  (*Id.* at 18-24)

17 4.  "The trial court abused its discretion by refusing to order that the Department
   of Public Safety disclose Austin Del Castillo's security guard clearance application
18 that would have provided relevant impeachment evidence and thereby violated
   [Petitioner's] rights under the Sixth Amendment, U.S. Constitution." (*Id.* at 24-26)
19
20 5.  "The State failed to present substantial evidence that proved [Petitioner's]
   guilt beyond a reasonable doubt as an accomplice to a sexual assault by
21 codefendant Guy Wooten [Count II].  The trial court abused its discretion when
   it denied [Petitioner's] Motion for a Directed Verdict."  (*Id.* at 26-27)

22 6.  "The State failed to present substantial evidence that proved [Petitioner's]
   guilt beyond a reasonable doubt of sexually assaulting the victim in the
23 bathroom [Count IV].  The trial court abused its discretion when it denied
   [Petitioner's] Motion for a Directed Verdict."  (*Id.* at 27-29)
24
25 7.  "The trial court erroneously refused to instruct the jury on the lesser-included
   offense of sexual abuse and thereby violated [Petitioner's] rights under the
26 Fifth, Sixth, and Fourteenth Amendments, U.S. Constitution."  (*Id.* at 29-31)

27 8.  "The reasonable doubt instruction impermissibly lowered the State's
   burden of proof and deprived [Petitioner] of his rights to a jury trial and due
   process under the Sixth and Fourteenth Amendments."  (*Id.* at 31-33)
28

9.  "The jury instructions defining the especially cruel, heinous, or depraved aggravating factor was inadequate, erroneous, and constitutionally vague in violation of the Eighth and Fourteenth Amendments, U.S. Constitution." (*Id*. at 33-36)

10. "[Petitioner's] consecutive sentences are in violation of his right to be free from double punishment under the Fifth Amendment, U.S. Constitution, and A.R.S. § 13-116." (*Id*. at 36-40)

On March 8, 2007, the Arizona Court of Appeals affirmed Petitioner's convictions and sentences in an unpublished opinion.  (Respondents' Exh. Z)   The Court of Appeals found that Petitioner waived his federal constitutional arguments on his claims related to: (1) the preclusion of the allegedly exculpatory evidence regarding Damien King; and (2) the trial court's allegedly vague jury instruction defining the aggravating circumstances of "especially cruel, heinous, or depraved."  (Respondents' Exh. Z at 8, 21)  The Court of Appeals also found that all of Petitioner's claims lacked merit.  (*Id*.)

On April 20, 2007, Petitioner filed a *pro se* petition for review in the Arizona Supreme Court, which summarily denied review on August 8, 2007.  (Respondents' Exhs. AA, BB)   Petitioner did not petition the United States Supreme Court for a writ of certiorari.

### D.  Post-Conviction Review

On June 26, 2007, Petitioner filed a notice of post-conviction relief in the trial court pursuant to Ariz.R.Crim.P. 32.  (Respondents' Exh. CC)   On July 10, 2007, the court assigned Petitioner counsel, Kerri Droban, for the Rule-32 proceedings. (Respondents' Exh. DD)

On December 10, 2007, Petitioner, through counsel, filed a petition for post-conviction relief, raising the following claim:

Trial counsel was ineffective under the United States and Arizona Constitutions for failure to raise evidentiary issues pretrial regarding the admission of William Watson's and Rita Anthony's criminal acts of sexual assault and kidnapping unrelated and outside of Petitioner's presence that ultimately led to prejudicing the jury's determination of a critical issue in the case - both guilt and the cruel, heinous, and depraved aggravator and sentencing.

(Respondents' Exh. EE at 4)

Petitioner identified the following evidence to which he contends his defense counsel should have objected:

> In [Petitioner's] case, the State introduced evidence primarily through [Francesca] (the victim) and Rita Anthony as to acts by Anthony and William [Billy] Watson that occurred on or about June 9, 2003. They testified as to the initial acts by William during which he threatened the victim, ordered her to have sex with him and perform sexual acts on both him and Anthony, and prance around his room wearing various items of lingerie. R.T. 4/12/05, at 99-113. They also testified that William severely whipped and beat the victim when she did not comply and when she continued to moan and cry with pain. *Id.* Anthony further testified after whipping the victim continuously with extension cords, William hog-tied her, including wrapping the cord around the victim's neck so tightly that she turned blue and almost died. *Id.* at 108-10. Photographs introduced throughout trial predominantly represented injuries sustained by William's and Anthony's acts to her neck, legs, buttocks, and back — particularly the most gruesome and heinous ones. R.T. 4/14/05, at 52-55.

(Respondents' Exh. EE at 5-6)

On March 17, 2008, the State filed its response, opposing Petitioner's request for post-conviction relief. (Respondents' Exh. FF) On May 12, 2008, the trial court[3] denied relief and dismissed the petition stating that:

> The Court has received the defendant's Petition for Post-Conviction Relief, and the State's Response to Petitioner for Post-Conviction Relief. The Court has reviewed the defendant's petition, the State's response, the file and records, and disregarding defects of form, it determines that no material issue of fact or law exists which would be served by any further proceedings . . . .
>
> * * *
>
> 1. The defendant has failed to show any colorable claim entitling him to post-conviction relief.
>
> 2. The defendant's allegations that he had ineffective assistance of counsel is not supported by the record. The conduct of William Watson and Rita Anthony was intrinsic to the crimes committed by the defendant. Additionally, the Court gave a limiting instruction on Absence of Other Participant. The defendant's trial counsel moved to preclude photographs of the victim prior to trial and argued that Watson and Anthony caused the injuries, not the defendant. The Court denied trial counsel's motion. The defendant's argument relating to the sentencing phase is also without merit. There was more than sufficient aggravating factors present to warrant an aggravated prison term irrespective of the cruel, heinous and depraved factor. The defendant fails to show both that trial counsel's performance was (1) not reasonable under all the circumstances and (2) there is a reasonable probability that but for counsel's unreasonable

---

[3] The Honorable Brian Ishikawa presided over post-conviction proceedings.

conduct the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668 (1994), and *State v. Mata*, 185 Ariz. 319, 916 P.2d 1035 (1996).

The Defendant's petition raises no material issue of fact or law which would entitle him to relief under Rule 32 and no purpose would be served by any further proceedings. Accordingly, dismissal is appropriate.

(Respondents' Exh. GG)

On May 28, 2008, Petitioner petitioned the Arizona Court of Appeals to review the denial of post-conviction relief. (Doc. 1-1 at 5) The appellate court summarily denied review on August 14, 2009. (Respondents' Exh. HH)

On November 30, 2009, Petitioner submitted a *pro se* petition for review to the Arizona Supreme court. (Respondents' Exh. II) The clerk of the Arizona Court of Appeals rejected and returned the pleading to Petitioner for non-compliance with several procedural rules. (Respondents' Exh. JJ) Petitioner never corrected the defects and did not petition the Arizona Supreme Court for review of the trial court's denial of post-conviction relief.

**E.  Federal Petition for Writ of Habeas Corpus**

Thereafter, Petitioner filed a timely Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court. (Doc. 1) Petitioner raises the following claims for relief:[4]

**Ground I:** Petitioner's Fifth Amendment "right to be free from double punishment" was violated when the trial court abused its discretion in the following way:

(A) The trial court disregarded the recommendations of defense counsel and the author of the pre-sentence report that the court impose concurrent prison terms for his convictions on Counts I, II, III, and IV, because "they all occurred during one continuous episode," and because the sexual assaults underlying Counts II and III were the "ultimate crime" for his kidnapping conviction in Count V. (Doc. 1 at 5) ("Ground I(A)")

(B) "The trial court ran counts I and IV consecutive to each other without any discussion as to whether he legally had the discretion to do otherwise," (*Id.*) ("Ground I(B)")

(C) "The trial court did have the discretion to impose concurrent terms for Counts II and III, which were imposed due to other

---

[4] Although Petitioner did not subdivide his grounds for relief, for ease of reference, the Court adopts Respondents' manner of identifying Petitioner's claims.

people's conduct." (*Id.*) ("Ground I(C)")

**Ground II:** Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were violated by the trial court's following rulings:

(A) The court refused to permit Petitioner "to call Andre Hamilton into court to be viewed by the jury." (Doc. 1 at 6) ("Ground II(A)")

(B) The court "refused to declare a mistrial or impose other appropriate sanctions against the State (prosecutors) for their (mis)conduct which resulted in the loss of Hamilton's exculpatory testimony at trial." (*Id.*) ("Ground II(B)")

(C and D) The court refused to permit Petitioner "to present probative evidence and argument relevant to [his] misidentification defense regarding an uncharged assailant named Damian King. (*Id.*)

> 1. the trial court erred by ruling that Petitioner could not call King to the stand to force him to invoke his Fifth Amendment privilege in the jury's presence; and
>
> 2. the trial court erred by granting the State's motion in limine to preclude Petitioner from eliciting testimony that King had not been charged with any crime in connection with the kidnapping and sexual assaults of Francesca. ("Grounds II(C) and (D)")

E. The trial court "erroneously refused to instruct the jury on [sexual assault's] lesser-included offense of sexual abuse" on Count II because "it was inconclusive whether Wooten or [Petitioner] ever penetrated the victim." (*Id.*) ("Ground II(E)")

**Ground III:** Trial counsel rendered ineffective assistance by failing to object to the admission of evidence of the abusive acts that Billy Watson and Rita Anthony committed against the victim on June 9, 2003, outside Petitioner's presence, which prejudiced the jury and led to Petitioner's convictions and the finding of the aggravating circumstance of especially cruel, heinous, or depraved. (Doc. 1 at 7)

**Ground IV:** The trial court violated Petitioner's right to a jury trial, due process, and a fair trial, as guaranteed by the Eighth and Fourteenth Amendments, by giving the following jury instructions:

(A) A reasonable-doubt instruction that contained "firmly convinced" language that lowered the State's burden of proof to "clear and convincing evidence." (*Id.* at 8) ("Ground IV(A)")

(B) An instruction defining the "especially cruel, heinous, or depraved" aggravating circumstance, which was "unconstitutionally vague." (*Id.*) ("Ground IV(B)")

Respondents have filed an Answer to the Petition, to which Petitioner has replied.

For the reasons set forth below, the Petition should be denied.

## II.  Exhaustion and Procedural Bar

Respondents argue that Grounds II(C), II(D), and IV(B) are procedurally defaulted and barred from federal habeas corpus review by virtue of the Arizona Court of Appeals' denial of those claims on the basis of an adequate and independent state-law ground.  (Doc. 12 at 34)   Petitioner asserts that he properly exhausted his claims.  (Doc. 16)  The Court will consider the procedural bar issue below.

### A.  Applicable Law

Ordinarily, a federal court may not grant a petition for writ of habeas corpus unless the petitioner has exhausted the state remedies available to him.  28 U.S.C. § 2254(b). When seeking habeas relief, petitioner bears the burden of showing that he has properly exhausted each claim.  *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981) (*per curiam*). The exhaustion inquiry focuses on the availability of state remedies at the time the petition for writ of habeas corpus is filed in federal court.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  The prisoner "shall not be deemed to have exhausted . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).  In other words, proper exhaustion requires the prisoner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. 845. "One complete round" includes filing a "petition[] for discretionary review when that review is part of the ordinary appellate review procedure in the State."  *Id.*

To exhaust state remedies, a petitioner must afford the state courts the opportunity to rule upon the merits of his federal claims by "fairly presenting" them to the state's "highest" court in a procedurally appropriate manner.  *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (stating that "[t]o provide the State with the necessary 'opportunity,' the prisoner must "fairly present" her claim in each appropriate state court . . . thereby alerting the court to the federal nature of the claim.").  In Arizona, unless a prisoner has been sentenced to death, the "highest court" requirement is satisfied if the petitioner has presented his federal claim to the Arizona Court of Appeals either on

direct appeal or in a petition for post-conviction relief. *Crowell v. Knowles*, 483 F.Supp.2d 925 (D.Ariz. 2007) (discussing *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).

In addition to presenting his claims to the proper court, a state prisoner must fairly present his claims to that court to satisfy the exhaustion requirement. A claim is "fairly presented" in state court only if a petitioner has described both the operative facts and the federal legal theory on which his claim is based. *Reese*, 541 U.S. at 28. It is not enough that all of the facts necessary to support the federal claim were before the state court or that a "somewhat similar" state law claim was raised. *Reese*, 541 U.S. at 28 (stating that a reference to ineffective assistance of counsel does not alert the court to federal nature of the claim). Rather, the habeas petitioner must cite in state court to the specific constitutional guarantee upon which he bases his claim in federal court. *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001). Similarly, general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish fair presentation of a federal constitutional claim. *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *amended on other grounds*, 247 F.3d 904 (9th Cir. 2001); *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir. 2000) (insufficient for prisoner to have made "a general appeal to a constitutional guarantee," such as a naked reference to "due process," or to a "constitutional error" or a "fair trial"). Likewise, a mere reference to the "Constitution of the United States" does not preserve a federal claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). Even if the basis of a federal claim is "self-evident" or if the claim would be decided "on the same considerations" under state or federal law, the petitioner must make the federal nature of the claim "explicit either by citing federal law or the decision of the federal courts . . . ." *Lyons*, 232 F.3d at 668. A state prisoner does not fairly present a claim to the state court if the court must read beyond the pleadings filed in that court to discover the federal claim. *Baldwin*, 541 U.S. at 27.

In sum, "a petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2)

1  through the proper vehicle, and (3) by providing the proper factual and legal basis for the

2  claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (citations omitted).

3        A habeas petitioner's claims may be precluded from federal review in either of two

4  ways.  First, a claim may be procedurally defaulted in federal court if it was actually raised

5  in state court but found by that court to be defaulted on state procedural grounds such as

6  waiver or preclusion.  *See Beard v. Kindler*, ___ U.S.___, 130 S.Ct. 612, 614-19 (2009); *Ylst*

7  *v. Nunnemaker*, 501 U.S. 797, 802-05 (1991); *Coleman*, 501 U.S. at 729-30.  Thus, a

8  petitioner may be barred from raising federal claims that he did not preserve in state court by

9  making a contemporaneous objection at trial, on direct appeal, or when seeking post-

10  conviction relief.  *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir. 1995) (stating that failure to

11  raise contemporaneous objection to alleged violation of federal rights during state trial

12  constitutes a procedural default of that issue); *Thomas v. Lewis*, 945 F.2d 1119, 1121 (9th

13  Cir. 1991) (finding claim procedurally defaulted where the Arizona Court of Appeals held

14  that habeas petitioner had waived claims by failing to raise them on direct appeal or in first

15  petition for post-conviction relief.)  If the state court also addressed the merits of the

16  underlying federal claim, the "alternative" ruling does not vitiate the independent state

17  procedural bar.  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Carringer v. Lewis*, 971

18  F.2d 329, 333 (9th Cir. 1992) (state supreme court found ineffective assistance of counsel

19  claims "barred under state law," but also discussed and rejected the claims on the merits, *en*

20  *banc* court held that the "on-the-merits" discussion was an "alternative ruling" and the

21  claims were procedurally defaulted and barred from federal review).  A higher court's

22  subsequent summary denial of review affirms the lower court's application of a procedural

23  bar.  *Nunnemaker*, 501 U.S. at 803.   However, "in order to constitute adequate and

24  independent grounds sufficient to support a finding of procedural default, a state rule must

25  be clear, consistently applied, and well-established at the time of Petitioner's default." *Wells*

26  *v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994).   The Supreme Court had held that "a

27  discretionary state procedural rule can serve as an adequate ground to bar federal habeas

28  review," and that "a discretionary rule can be 'firmly established' and 'regularly followed' -

even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not in others." *Kindler*, 130 S.Ct. at 618.   Likewise, occasionally excusing non-compliance with a procedural rule does not render a state procedural bar inadequate. *See Dugger v. Adams*, 489 U.S. 401, 410-12 n. 6 (1989).

Arizona courts have been consistent in their application of procedural default rules. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (holding that Arizona Rule of Criminal Procedure 32.2(a) is an adequate and independent procedural bar); *Cook v. Schriro*, 538 F.3d 1000, 1026 (9th Cir. 2008) (stating that "[p]reclusion of issues for failure to present them at an earlier proceeding under Arizona Rule of Criminal Procedure 32.2(a)(3) 'are independent of federal law because they do not depend upon a federal constitutional ruling on the merits.'") (footnote omitted) (quoting *Smith*, 536 U.S. at 860); *Ortiz v. Stewart*, 149 F.3d 923, 931-32 (9th Cir. 1998) (rejecting argument that Arizona courts have not "strictly or regularly" followed Rule 32).

The second procedural default scenario arises when a petitioner failed to present his federal claims to the state court, but returning to state court would be "futile" because the state courts' procedural rules, such as waiver or preclusion, would bar consideration of the previously unraised claims.  *See Teague v. Lane*, 489 U.S. 288, 297-99 (1989); *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *State v. Mata*, 185 Ariz. 319, 322-27, 916 P.2d 1035, 1048-53 (1996); Ariz. R. Crim. P. 32.2(a) & (b); Ariz. R. Crim. P. 32.1(a)(3) (post-conviction review is precluded for claims waived at trial, on appeal, or in any previous collateral proceeding); 32.4(a); Ariz. R. Crim. P. 32.9 (stating that petition for review must be filed within thirty days of trial court's decision).  A state post-conviction action is futile where it is time-barred.  *Beaty*, 303 F.3d at 987; *Moreno v. Gonzalez*, 116 F.3d 409, 410 (9th Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under Rule 32.2(a)).  This type of procedural default is known as "technical" exhaustion because although the claim was not actually exhausted in state court, the petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted

1   his federal claims in state court meets the technical requirements for exhaustion; there are no

2   remedies any longer 'available' to him.").

3       In either case of procedural default, federal review of the claim is barred absent a

4   showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Dretke v.*

5   *Haley*, 541 U.S. 386, 393-94, (2004); *Hughes,* 800 F.2d at 907-08. To establish "cause," a

6   petitioner must establish that some objective factor external to the defense impeded his

7   efforts to comply with the state's procedural rules. *Id.* The following objective factors may

8   constitute cause: (1) interference by state officials, (2) a showing that the factual or legal

9   basis for a claim was not reasonably available, or (3) constitutionally ineffective assistance

10  of counsel. *Id.* Ordinarily, the ineffective assistance of counsel in collateral proceedings

11  does not constitute cause because "the right to counsel does not extend to state collateral

12  proceedings or federal habeas proceedings." *Martinez-Villareal v. Lewis*, 80 F.3d 1301,

13  1306 (9th Cir. 1996).

14      Prejudice is actual harm resulting from the constitutional violation or error. *Magby v.*

15  *Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984). To establish prejudice, a habeas petitioner

16  bears the burden of demonstrating that the alleged constitutional violation "worked to his

17  actual and substantial disadvantage, infecting his entire trial with error of constitutional

18  dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982); *Thomas v. Lewis*, 945 F.2d

19  1119, 1123 (9th Cir. 1996). Where petitioner fails to establish cause, the court need not

20  reach the prejudice prong.

21      A federal court may also review the merits of a procedurally defaulted claim if

22  petitioner demonstrates that failure to consider the merits of his claim will result in a

23  "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). A

24  "fundamental miscarriage of justice" occurs when a constitutional violation has probably

25  resulted in the conviction of one who is actually innocent. *Id.* To satisfy the "fundamental

26  miscarriage of justice" standard, petitioner must establish that it is more likely than not that

27  no reasonable juror would have found him guilty beyond a reasonable doubt in light of new

28  evidence. *Id.* at 327; 28 U.S.C. § 2254(c)(2)(B). Even if a petitioner asserts a claim of

1   actual innocence to excuse his procedural default of a federal claim, federal habeas relief

2   may not be granted absent a finding of an independent constitutional violation occurring in

3   the state criminal proceedings. *Dretke*, 541 U.S. at 393-94.

4       **B.  Grounds II(C) and II(D)**

5       In Ground II(C), Petitioner argues that the trial court violated his right to present a

6   defense when it denied Petitioner's request to call Damien King to the witness stand at trial

7   so that Petitioner could force him to invoke his Fifth Amendment privilege against self-

8   incrimination in the jury's presence.   In Ground II(D), Petitioner argues that the trial court

9   violated his right to present a defense when it ruled that Petitioner could not offer evidence

10  that the State had not charged King with any crime in connection with the kidnapping and

11  sexual assaults of Francesca.  (Doc. 1 at 6)   Respondents assert that Grounds II(C) and (D)

12  are procedurally defaulted and barred from federal habeas corpus review.  (Doc. 12 at 41)

13  Petitioner argues that his claims are properly before this Court.  (Doc. 16)

14      Petitioner presented both claims challenging the trial court's rulings regarding

15  Damien King to the Arizona court on direct appeal.  The Arizona Court of Appeals

16  ultimately ruled that Petitioner had "waived the constitutional argument in [Grounds II(C)

17  and II(D) involving King] by failing to present it at trial." (Respondents' Exh. Z at 8)   The

18  appellate court further explained that:

19          Because King was not a State witness, the prosecutor made a motion
        *in limine* to preclude evidence 'not whether or not Damien King was there,
20      but there should be no mention of the fact that he was neither charged nor
        arrested for these crimes.'  Noting that the prosecutor did not intend to 'preclude
21      any testimony as to the others as to what they observed Mr. King do or his
        identification,' [Petitioner] objected on the basis that 'it certainly goes to
22      everybody's credibility as to what happened to Mr. King.'  The court granted
        the prosecutor's motion to preclude the evidence.
23
            During trial, defense counsel learned that King intended to assert his
24      Fifth-Amendment right against self-incrimination at [Petitioner's] trial.  Counsel
        then requested that the court allow him to call King to the stand for the sole
25      purpose of displaying a tattoo on the back of his neck that stated "ATL."

26          The trial court ruled that [Petitioner] could not call King to the stand.
        It said, however, that the prosecutor could recall Detective Shumaker to identify
27      King, and defense counsel could ask King to display his tattoo to the jury.

28          Because a defense was mistaken identity, [Petitioner] claims on appeal

- 23 -

that the trial court abused its discretion in granting the prosecutor's motion because the evidence that King was not charged and arrested was relevant to his defense of third-party culpability. [Petitioner] argues from this proposition that his constitutional right to present his defense was compromised.

[Petitioner] also insists that the trial court should have permitted him to call King to the stand. He maintains that the court's limited ruling allowing the jury to see King's tattoo did not cure the error created by precluding evidence that King was not charged in the case.

First, [Petitioner] waived the constitutional argument by failing to present it at trial. *See State v. Baldenegro*, 188 Ariz. 10, 14, 932 P.2d 275, 279 ([Ariz. Ct] App. 1996). [FN 4: Even if [Petitioner's] request to call King to testify after King had exercised his Fifth-Amendment privilege preserved the issue for review, the trial court did not abuse its discretion in denying this request. *See State v. Henry*, 176 Ariz. 569, 580-81, 863 P.2d 872-73 ([Ariz.] 1993) (The trial court did not abuse its discretion in denying the defendant's request to call a witness when the witness would have claimed his Fifth Amendment privilege in front of the jury.).]

Second, the trial court did not err in precluding as irrelevant evidence that King was neither charged nor arrested. In *State v. Gibson*, 202 Ariz. 321, 324, ¶ 19, 44 P.3d 1001, 1004 ([Ariz.] 2002), the Arizona Supreme Court held that the Arizona Rules of Evidence ("Rules") 401, 402, and 403 'set forth the proper test for determining the admissibility of third-party culpability evidence.' Applying those rules, the court held that '[t]he proper focus in determining relevancy is the effect the evidence has upon the defendant's culpability. To be relevant, the evidence need only tend to create a reasonable doubt as to the defendant's guilt.' *Id.* at ¶ 16.

The trial court did not preclude [Petitioner] from introducing testimony that King may have been the person who committed the charged offenses, and it did not prevent him from asserting a third-party culpability defense. However, evidence that King was neither charged nor arrested is not relevant to the issue whether [Petitioner] was guilty of the offenses . . . We find no error.

(Respondents' Exh. Z at 7-9)

As set forth above, the Arizona Court of Appeals found that Petitioner had waived his constitutional arguments by not presenting them to the trial court. In other words, the Arizona Court of Appeals found Petitioner's constitutional arguments pertaining to King were procedurally defaulted on state procedural grounds. *See Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999) (finding petitioner's failure to make timely objections at trial constituted grounds for finding federal claim procedurally barred from § 2254 review). Contrary to Petitioner's assertion in his Reply, Arizona courts have consistently invoked the waiver doctrine to preclude review of federal claims that defendant never presented to the

1   trial court.  *See State v. Trostle*, 191 Ariz. 4, 13, 951 P.2d 869, 877 (Ariz. 1997) (*en banc*)

2   (citing *State v. Bible*, 175 Ariz. 549, 572, 858 P.2d 1152, 1175 (Ariz. 1993)).  Here, the

3   Arizona Court of Appeals' finding that Petitioner waived his constitutional arguments

4   regarding King results in a procedural bar, notwithstanding the appellate court's observation

5   that, "[e]ven if [Petitioner's] request to call King to testify after King had exercised his

6   Fifth-Amendment privilege preserved the issue for review, the trial court did not abuse its

7   discretion in denying this request."  (Respondents' Exh. Z at 8 n. 4)   "The fact that the court

8   went on to discuss the lack of merit of some or all of the [procedurally-precluded claims]

9   does not eliminate the procedural bar."  *Poland*, 169 F.3d at 586 n. 8 (citing *Harris v. Reed*,

10  489 U.S. 255, 264 n. 10 (1989)).

11       To the extent that Petitioner challenges that Arizona Court of Appeals' determination

12  based on Arizona Rules of Evidence 401, 402, and 403, that "evidence that King was neither

13  charged nor arrested is not relevant to the issue whether [Petitioner] was guilty of the

14  offenses," Respondents' Exh. Z at 9, such a claim is not cognizable on federal habeas corpus

15  review because it is based on state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (stating

16  that "[i]t is not the province of a federal court to re-examine the state court determinations of

17  state law questions.").

18           Finally, even if Petitioner's constitutional challenges to the trial court's ruling

19  pertaining to King were properly before this Court, Petitioner has not shown that the State

20  courts' determination that the evidence at issue was irrelevant and therefore inadmissible

21  was contrary to, or an unreasonable application of, clearly established federal law as

22  determined by the Supreme Court.  *See Clark v. Arizona*, 548 U.S. 735, 770 (2006) (stating

23  that "'[w]hile the Constitution . . . prohibits the exclusion of defense evidence under rules

24  that serve no legitimate purpose or that are disproportionate to the ends that they are asserted

25  to promote, well-established rules of evidence permit trial judges to exclude evidence if its

26  probative value is outweighed by certain other factors such as unfair prejudice, confusion of

27  the issues, or potential to mislead the jury.'") (quoting *Holmes v. South Carolina*, 547 U.S.

28  319, 326 (2006)).

1    In view of the foregoing, Petitioner is not entitled to habeas corpus relief on Grounds

2    II(C) and II(D).

3    **C. Ground IV(B)**

4    In Ground IV(B), Petitioner argues that the trial court violated his rights to due

5    process and a fair trial by giving a jury instruction which defined the "especially cruel,

6    heinous or depraved" aggravating circumstance in an unconstitutionally vague manner.

7    (Doc. 1 at 8)   Respondents argue that this claim is procedurally barred from federal habeas

8    corpus review because the Arizona Court of Appeals rejected this claim on the basis of an

9    adequate and independent state procedural rule.  Petitioner presented this claim on direct

10   appeal.  The Arizona Court of Appeals rejected it on the ground that Petitioner had "invited"

11   the error and, therefore, was precluded from challenging the jury instruction defining

12   "especially cruel, heinous, or depraved."  (Respondents' Exh. Z at 21)  The Court of

13   Appeals explained that:

14   [Petitioner] claims that the trial court erred when it instructed the jury
     on the aggravating factors of 'cruel,' 'heinous' or 'depraved.' He insists that
15   the definitions were unconstitutionally vague.

16   Both [Petitioner] and the prosecutor submitted proposed jury instructions,
     and the trial court gave the jury the instructions defining 'cruel,' 'heinous,'
17   and 'depraved' that [Petitioner] requested.  '[W]hen a party requests an
     erroneous instruction, any resulting error is invited and the party waives
18   his right to challenge the instruction on appeal.'  *State v. Logan*, 200 Ariz.
     564, 565, 30 P.3d 631, 632 ([Ariz.] 2001).  We therefore will not consider
19   [Petitioner's] argument of alleged constitutional infirmity.

20   (Respondents' Exh. Z at 21)

21   Arizona courts have consistently held that a defendant who invites error has waived a

22   subsequent challenge to it on appeal because a party "'may not be heard [on appeal] to decry

23   a result fashioned by its own handiwork.'"  *State v. Moreno*, 173 Ariz. 471, 473, 844 P.2d

24   638, 640 (Ariz.Ct.App. 1992) (quoting *Sisson v. State*, 16 Ariz. 170, 175, 141 P. 713, 714-15

25   (1914)).  Specifically, Arizona courts have consistently applied the invited-error doctrine to

26   appellate challenges to jury instructions that a defendant proposed or helped draft.  *See State*

27   *v. Logan*, 200 Ariz. 564, 566-67, 30 P.3d 631, 633-34 (Ariz. 2000) (citing cases).  The

28   invited-error doctrine is an adequate and independent state procedural rule upon which the

1   Arizona Court of Appeals relied to reject Petitioner's challenge to the "heinous, cruel, and

2   depraved" jury instruction.  Accordingly, Ground IV(B) is procedurally barred from federal

3   habeas corpus review.  *See Beard v. Kindler*, ___ U.S.___, 130 S.Ct. 612, 614-19 (2009);

4   *Nunnemaker*, 501 U.S. at 802-05.

5        Moreover, Petitioner's claim asserted in Ground IV(B) lacks merit.  Petitioner was

6   not tried for a capital offense, thus the Eighth Amendment vagueness inquiry does not apply.

7   *See Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (stating that [o]ur cases creating and

8   clarifying the 'individualized capital sentencing doctrine' have repeatedly suggested that

9   there is no comparable requirement outside the capital context, because of the qualitative

10  difference between death and all other penalties."); *Holman v. Page*, 95 F.3d 481, 87 (7th

11  Cir. 1996) (stating that "it is now established . . . that the Eighth Amendment vagueness

12  inquiry does not apply in noncapital cases."), *overruled on other grounds by, Owens v. U.S.*,

13  387 F.3d 607 (7th Cir. 2004).  Additionally, Petitioner's vagueness challenge to the

14  definitions of "especially cruel, heinous, or depraved," fails to consider that "definition of an

15  aggravating factor of this nature is not susceptible of mathematical precision."  *Mata*, 185

16  Ariz. at 324, 916 P.2d at 1040; *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973) ("Words

17  inevitably contain germs of uncertainty . . . ."); *Holman*, 95 F.3d at 487 ("On some level,

18  virtually every verbal or written formulation is vague; there is always some circumstance

19  that puts interpretative pressure on a word and exposes the limits of its meaning.  When it

20  comes to terms like 'exceptionally brutal,' 'heinous,' and 'wanton cruelty,' - all resounding

21  with strong moral condemnation - precise meaning is probably impossible.  Thus, in the

22  application, terms like 'wantonly cruelty' will at some point be subject to a judgment call

23  and a charge of vagueness.").

24        For the foregoing reasons, Petitioner is not entitled to relief on Ground IV(B).

25        **D.  Overcoming the Procedural Bar**

26        As set forth above, Grounds II(C), II(D), and IV(B) are procedurally defaulted and

27  barred from federal habeas corpus review absent a showing of "cause and prejudice" or a

28  "fundamental miscarriage of justice."

### 1. Cause and Prejudice

To establish "cause," a petitioner must establish that some objective factor external to the defense impeded his efforts to comply with the state's procedural rules. *Murray*, 477 U.S. at 488-492.  The following objective factors may constitute cause: (1) interference by state officials, (2) a showing that the factual or legal basis for a claim was not reasonably available, or (3) constitutionally ineffective assistance of counsel.  *Id.* Prejudice is actual harm resulting from the constitutional violation or error.  *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984).  Where petitioner fails to establish cause for his procedural default, the court need not consider whether petitioner has shown actual prejudice resulting from the alleged constitutional violations.  *Smith v. Murray*, 477 U.S. 527, 533 (1986).

In an effort to overcome the procedural bar, Petitioner baldly asserts that the procedural rules upon which the Arizona Court of Appeals relied in rejecting his claims were not adequate and independent, or regularly followed, Petitioner does not assert any basis to overcome the procedural bar.  (Doc. 16 at 3)   As set forth above, the procedural grounds upon which the Arizona Court of Appeals relied in rejecting Grounds II(C), II(D), and IV(B), were both adequate and independent, and regularly followed.   Petitioner does not assert any other basis to overcome the procedural bar.  Because Petitioner offers no legitimate "cause" which precluded him from properly exhausting his state remedies as to Grounds II(C), II(D), and IV(B), the Court declines to reach the issue of prejudice.  *Engle*, 456 U.S. at 134 n. 43.

### 2. Fundamental Miscarriage of Justice

Additionally, Petitioner has not shown that failure to consider Grounds II(C), II (D), and IV(B) will result in a fundamental miscarriage of justice. A federal court may review the merits of a procedurally defaulted habeas claim if the petitioner demonstrates that failure to consider the merits of his claim will result in a "fundamental miscarriage of justice." *Schlup*, 513 U.S. at 327.  A "fundamental miscarriage of justice" occurs when a

1   constitutional violation has probably resulted in the conviction of one who is actually

2   innocent. *Id.*

3          This gateway "actual innocence" claim differs from a substantive actual innocence

4   claim. *Smith v. Baldwin*, 466 F.3d 805, 811-12 (9th Cir. 2006). The Supreme Court

5   described the gateway showing in *Schlup*, 513 U.S. at 315-16, as a less stringent standard

6   than a substantive claim of actual innocence. *See also Carriger v. Stewart*, 132 F.3d 463,

7   476 (9th Cir. 1997) (suggesting that a "habeas petitioner asserting a freestanding innocence

8   claim must go beyond demonstrating doubt about his guilt and must affirmatively prove that

9   he is innocent."). If Petitioner passes through the *Schlup* gateway, the court is only

10  permitted to review his underlying constitutional claims. *Smith*, 466 F.3d at 807. The

11  fundamental miscarriage of justice exception applies only to a "narrow class of cases" in

12  which a petitioner makes the extraordinary showing that an innocent person was probably

13  convicted due to a constitutional violation. *Schlup*, 513 U.S. at 231. To demonstrate a

14  fundamental miscarriage of justice, Petitioner must show that "a constitutional violation has

15  resulted in the conviction of one who is actually innocent." *Id*. at 327. To establish the

16  requisite probability, Petitioner must prove with new reliable evidence that "it is more likely

17  than not that no reasonable juror would have found petitioner guilty beyond a reasonable

18  doubt." *Id*. New evidence presented in support of a fundamental miscarriage of justice may

19  include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

20  physical evidence that was not presented at trial." *Id*. at 324, *see also, House v. Bell*, 547

21  U.S. 518 (2006) (stating that a fundamental miscarriage of justice contention must involve

22  evidence that the trial jury did not have before it).

23         Petitioner has not established that, in light of newly discovered evidence, "it is more

24  likely than not that no reasonable juror would have found petitioner guilty beyond a

25  reasonable doubt." *Schlup*, 513 U.S. at 324, 327.

26  **III. Analysis**

27         Respondents concede that Petitioner's claims raised in the remaining Grounds for

28  relief are properly before the Court on habeas corpus review.   Respondents, however, argue

1    that Petitioner is not entitled to habeas corpus relief because he has not established that the

2    Arizona courts' resolution of his claims was based on an unreasonable determination of the

3    facts; or that the Arizona courts' determination was either contrary to, or based an

4    unreasonable application of, clearly established federal law.  28 U.S.C. 2254(d).

5    **A.  Standard of Review**

6          This Court's consideration of the merits of Petitioner's claims is constrained by the

7    applicable standard of review set forth in 28 U.S.C. § 2254(d), as amended in 1996 by the

8    Antiterrorism and Effective Death Penalty Act ("AEDPA").  The ADEPA "modified a

9    federal habeas court's role in reviewing state prisoner applications in order to prevent

10    federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

11    extent possible under the law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).  The standard in §

12    2254(d) is "meant to be" "difficult to meet." *Harrington v. Richter*, ___ U.S., ___ , 131 S.Ct.

13    770, 786 (2011).  Section "2254 stops short of imposing a complete bar on federal court

14    relitigation of claims already rejected in state court proceedings." *Id*. (citations omitted).

15    "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme

16    malfunction in the state criminal justice systems,' not a substitute for ordinary error

17    correction through appeal." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979)).

18          Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is

19    shown that the earlier state court's decision "was contrary to" federal law then clearly

20    established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v.*

21    *Taylor*, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such

22    law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in

23    light of the record before the state court, § 2254(d)(2).  *Richter*, 131 S.Ct. at 785; *see also*

24    *Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir.  2006).  To determine whether a state court

25    ruling was "contrary to" or involved an "unreasonable application" of federal law, courts

26    look exclusively to the holdings of the Supreme Court which existed at the time of the state

27    court's decision.  *Richter*, 131 S.Ct. at 786 (citing *Renico v. Lett*, 559 U.S. ___ , ___, 130

28    S.Ct. 1855, 1866, 176 L.Ed.2d 678 (2010)).  The Ninth Circuit has acknowledged that it

1    cannot reverse a state court decision merely because that decision conflicts with Ninth

2    Circuit precedent on a federal constitutional issue. *Brewer v. Hall*, 378 F.3d 952, 957 (9th

3    Cir. 2004); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Even if the state court

4    neither explains its ruling nor cites United States Supreme Court authority, the reviewing

5    federal court must nevertheless examine Supreme Court precedent to determine whether the

6    state court reasonably applied federal law. *Richter*, 131 S.Ct. at 784 (citing *Early v. Packer*,

7    537 U.S. 3, 8 (2003)). The Supreme Court held in *Early*, and recently reaffirmed in *Richter*,

8    that citation to federal law is not required and that compliance with the habeas statute "does

9    not even require awareness of our cases, so long as neither the reasoning nor the result of the

10   state-court decision contradicts them." *Early*, 537 U.S. at 8; *Richter*, 131 S.Ct. at 784.

11   "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's

12   burden still must be met by showing there was no reasonable basis for the state to deny

13   relief. This is so whether or not the state court reveals which of the elements in a multipart

14   claim it found insufficient, for § 2254(d) applies when a 'claim', not a component of one,

15   has been adjudicated." *Richter*, 131 S.Ct. at 784.

16           Under § 2254(d), a state court's decision is "contrary to" federal law if it applies a

17   rule of law "that contradicts the governing law set forth in [Supreme Court] cases or if it

18   confronts a set of facts that are materially indistinguishable from a decision of [the Supreme

19   Court] and nevertheless arrives at a result different from [Supreme Court] precedent."

20   *Mitchell v. Esparza*, 540 U.S 12, 14 (2003) (citations omitted); *Williams*, 529 U.S. at 411. A

21   state court decision is an "unreasonable application of" federal law if the court identifies the

22   correct legal rule, but unreasonably applies that rule to the facts of a particular case.

23   *Williams*, 529 U.S. at 405; *Brown v. Payton*, 544 U.S. 133, 141 (2005). An incorrect

24   application of federal law does not satisfy this standard. *Yarborough v. Alvarado*, 541 U.S.

25   652, 665-66 (2004) (stating that "[r]elief is available under § 2254(d)(1) only if the state

26   court's decision is objectively unreasonable."). "A state court's determination that a claim

27   lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree on

28   the correctness of the state court's decision.'" *Richter*, 131 S.Ct. 786 (citing *Yarborough*,

541 U.S. at 664).  "'[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determination.'" *Richter*, 131 S.Ct. at 786 (citing *Yarborough*, 541 U.S. at 664).

The habeas court presumes that the state court's factual determinations are correct and petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1) (stating that "a determination of factual issues made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Williams v. Rhoades*, 354 F.3d 1101, 1106 (9th Cir. 2004).

Where a state court decision is deemed  "contrary to" or an "unreasonable application of" clearly established federal law, the reviewing court must next determine whether it resulted in constitutional error.  *Benn v. Lambert*, 283 F.3d 1040, 1052 n. 6 (9th Cir. 2002).  On habeas review, the court assesses the prejudicial impact of most constitutional errors by determining whether they "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112 (2007) (*Brecht* standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  The *Brecht* harmless error analysis also applies to habeas review of a sentencing error.  The test is whether such error had a "substantial and injurious effect" on the sentence.  *Calderon v. Coleman*, 525 U.S. 141, 145-57 (1998) (holding that for habeas relief to be granted based on constitutional error in capital penalty phase, error must have had substantial and injurious effect on the jury's verdict in the penalty phase.); *Hernandez v. LaMarque*, 2006 WL 2411441 (N.D.Cal., Aug. 18, 2006) (finding that even if the evidence of three of petitioner's prior convictions was insufficient, petitioner was not prejudiced by the court's consideration of those convictions because the trial court found four other prior convictions which would have supported petitioner's sentence.)  However, some constitutional errors do not require that the petitioner demonstrate prejudice. *Musladin v.*

- 32 -

*Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *United States v. Cronic*, 466 U.S. 648, 659 (1984)). The Court will review Petitioner's claims under the applicable standard of review.

## B. Grounds I(A), (B), and (C)

In Ground One, Petitioner argues that the trial court violated his "right to be free from double punishment under the United States Constitution's Fifth Amendment."  (Doc. 1 at 5)

On direct appeal, Petitioner argued that "it [was] not constitutionally permissible to impose consecutive sentences for [his sexual assault convictions in] Counts II and III," because he had committed these two offenses by engaging in "the same course of conduct," which was "to hold one of the victim's legs" while his accomplices (Keoni and Wooten) took turns sexually assaulted her.  (Respondents' Exh. Y at 39)   Petitioner tried to distinguish his case from Arizona opinions upholding consecutive sentences for multiple sex acts committed against the same victim in quick succession, by arguing that the sexual-assault convictions in Counts II and III "were for actions taken by his codefendants that occurred during the same transaction which [he] committed during a single act of sexual assault."  (Respondents' Exh. Y at 39-40; distinguishing *State v. Williams*, 182 Ariz. 548, 898 P.2d 497 (Ariz.Ct.App. 1995); *State v. Boldrey*, 176 Ariz. 378, 861 P.2d 663 (Ariz.Ct. App. 1993); *State v. Arnoldi*, 176 Ariz. 236, 860 P.2d 503 (Ariz.Ct.App. 1993)).

On direct appeal, Petitioner also asserted a statute-based challenge to his sentences on all four of his sexual assault convictions.  Petitioner argued that the trial court erred by ordering that his sentences for Counts I, II, III, and IV run consecutively because: (1) the court mistakenly considered the controlling statute to be A.R.S. § 13-1406(C); and (2) the court assumed that A.R.S. § 13-708 mandated consecutive sentences, notwithstanding the Arizona Supreme Court's holding in *State v. Garza*, 192 Ariz. 71, 74, 962 P.2d 898, 901 (1998), that this statute did not create a presumption of consecutive sentences when "multiple sentences of imprisonment are imposed on a person at the same time." (Respondents' Exh. Y at 36-37)   Petitioner argued that the trial court could have imposed concurrent sentences had it understood that the controlling sentencing statute was A.R.S. §

1    13-116, which provides that "[a]n act or omission which is made punishable in different

2    ways by different sections of the laws may be punishment under both, but in no event may

3    sentences be other than concurrent."  (Respondents' Exh. Y at 37-38)   Petitioner asserted

4    that the trial court should have recognized that A.R.S. §§ 13-708, and 13-1406(C) did not

5    mandate consecutive prison sentences because both the pre-sentence report writer and

6    defense counsel had recommended the imposition of concurrent sentences for Counts I, II,

7    III, and V.  (Respondents' Exh. Y at 37-38)

8            In his Petition for Writ of Habeas Corpus, Petitioner supports his double jeopardy

9    claim with language from foregoing passages of his appellate brief which allege that the trial

10   court misconstrued or misapplied the applicable Arizona sentencing statutes.  (Doc. 1 at 5)

11   Thus, although Petitioner labels Ground One as a Fifth Amendment double jeopardy claim,

12   he also raises several state-law arguments:

13           **Ground I(A):** the trial court erred in disregarding the recommendations of
             defense counsel and the pre-sentence report writer that Petitioner receive
14           concurrent prison sentences for his convictions on Counts I, II, III, and IV,
             because "they all occurred during one continuous episode," and because
15           the sexual assaults underlying Counts II and III were the "ultimate crime'
             for his kidnapping conviction in Count V.
16
             **Ground I(B):**  "The trial court ran counts I [and] IV consecutive to each other
17           without any discussion as to whether he legally had discretion to do
             otherwise."
18
             **Ground I(C):**  "The court did have the discretion to impose concurrent
19           terms for Counts II [and] III, which were imposed due to other people's
             conduct."
20
21   (Doc. 1 at 5)

22           As Respondents argue, Petitioner essentially challenges the trial court's failure to

23   recognize that Arizona's sentencing statutes permitted the imposition of concurrent

24   sentences for Petitioner's sexual assault convictions.  Petitioner's claim is based on the

25   application of state law which is not subject to habeas corpus review by this Court.  *See*

26   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (explaining that "it is not the province of a

27   federal habeas court to reexamine state-court determinations on state-law questions.").  A

28   state prisoner can obtain federal habeas corpus relief only if his conviction violates the

1  Constitution or the laws and treaties of the United States.  *See Engle v. Isaac*, 456 U.S. 107,

2  119 (1982).  Federal habeas corpus relief does is not available for alleged error in the

3  interpretation or application of state law.  *Estelle*, 502 U.S. at 67-68; *Peltier v. Wright*, 15

4  F.3d 860, 861-62 (9th Cir. 1994).  Accordingly, this Court lacks authority to consider

5  Grounds I(A), (B), and (C) to the extent that Petitioner challenges the trial court's

6  application of Arizona law.  *See Souch v. Schriro*, 289 F.3d 616, 623 (9th Cir. 2002) (holding

7  that habeas relief was not available when Arizona court imposed consecutive sentences

8  without complying with A.R.S. § 13-708); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1044 (9th

9  Cir. 1997) (rejecting claim that state court improperly double-counted an aggravating

10 circumstance on the ground that it was a state-law issue); *Cacoperdo v. Demosthenes*, 37

11 F.3d 504, 507 (9th Cir. 1994) (stating that the "decision whether to impose sentences

12 concurrently or consecutively is a matter of state criminal procedure and is not within the

13 purview of federal habeas corpus."); *Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir.

14 1989) (refusing to consider alleged errors in violation of state sentencing law).

15        To the extent that Ground One also alleges a double jeopardy claim under the United

16 States Constitution, it also fails.  (Doc. 1 at 5)   The guarantee against double jeopardy

17 protects against (1) a second prosecution for the same offense after acquittal, (2) a second

18 prosecution for the same offense after conviction, and (3) multiple punishments for the same

19 offense. *Ohio v. Johnson*, 467 U.S. 493, 498 (1984); *United States v. DiFrancesco*, 449 U.S.

20 117, 129 (1980); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).   Where "cumulative

21 sentences [are] imposed in a single trial, the Double Jeopardy Clause does no more than

22 prevent the sentencing court from prescribing greater punishment than the legislature

23 intended."  *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).  *See Albernaz v. United States*,

24 450 U.S. 333, 344 (1981) ("Where consecutive sentences are imposed at a single criminal

25 trial, the role of the constitutional guarantee is limited to assuring that the court does not

26 exceed its legislative authorization by imposing multiple punishments for the same

27 offense.") (quoting *Brown v. Ohio*, 432 U.S. 161, 165 (1977)).  "Thus, determining the

28 permissibility of imposing multiple punishments for one course of conduct is a matter of

1   discerning the legislature's intent." *United States v. Patel*, 370 F.3d 108, 114 (1st Cir. 2004)

2   (citing *Albernaz*, 450 U.S. at 344).

3       As previously stated, on direct review, the Arizona Court of Appeals rejected

4   Petitioner's challenge to the imposition of consecutive sentences on Counts II and III.

5   (Respondents' Exh. Z at 22-23)   The appellate court's conclusion was based on its

6   determination that the Arizona legislature intended that consecutive sentences be imposed

7   for the conduct at issue.  (*Id.*)   On habeas corpus review, this Court must defer to the

8   Arizona Court of Appeals' determination regarding the state legislature's intent.  *See*

9   *Cummings v. Evans*, 161 F.3d 610, 615 (10th Cir. 1988) (stating that on habeas corpus

10  review, the court is bound by the state court's determination regarding whether state

11  legislature intended to prescribe cumulative punishment.); *Hunter*, 459 U.S. at 368;

12  *Brimmage v. Sumner*, 793 F.2d 1014, 1015 (9th Cir. 1985) (stating that, on habeas corpus

13  review, "[w]e must accept the state court's interpretation of the legislative intent for the

14  imposition of multiple punishments, although we are not bound by that court's ultimate

15  conclusion concerning whether such punishments violate the Double Jeopardy Clause.").

16      In rejecting Petitioner's claim, the Arizona Court of Appeals concluded that A.R.S. §

17  13-116 did not prohibit the imposition of consecutive sentences for Counts II and III.  The

18  court stated:

19          Second, the facts showed that [Petitioner] held one of F.'s legs while
          Wooten attempted to sexually assault her.  He also hit, slapped, and elbowed F.,
20         enabling Keoni to sexually assault her.  Thus, [Petitioner] engaged in separate
          acts at different times to aid Wooten and Keoni in sexually assaulting F., and the
21         imposition of consecutive sentences was proper.  *See State v. Williams*, 182
          Ariz. 548, 562-63, 898 P.2d 497, 511-12 ([Ariz.Ct.] App. 1995) (the imposition
22         of consecutive sentences was proper if the defendant committed different
          acts of sexual assault during a single episode exposing one victim to different
23         harms.).

24  (Respondents' Exh. Z at 22-23)

25      The record supports the Arizona Court of Appeals' finding that Petitioner beat

26  Francesca before Keoni's sexual assault, and that Petitioner therefore had engaged in

27  conduct in addition to restraining one of Francesca's legs while Keoni and Wooten sexually

28  assaulted her.  Before Keoni sexually assaulted Francesca, Petitioner grabbed her hair,

1    forced her head toward his face, and then struck Francesca in the face with sufficient force

2    to cause her to fall and become motionless.  (Respondents' Exh. K, Tr. 4/21/05 at 122-24,

3    126-28)    Thereafter, Petitioner and Wooten held Francesca legs while Keoni had non-

4    consensual intercourse with her.  (Respondents' Exh. K, Tr. 4/21/05 at 124-25, 129-30)

5    The record indicates that there was an interval separating when Petitioner held one of

6    Francesca's legs to permit Wooten, and short time later, Keoni to sexually assault Francesca.

7    (Respondents' Exh. O, Tr. 5/2/05 at 33-39)    In between Wooten's and Keoni's assaults on

8    Francesca, Vanessa knocked on the door and someone inside handed her her purse.  Vanessa

9    saw Keoni pulling Francesca's shirt down.  Austin knocked on the door after Vanessa

10    retrieved her purse, and Keoni opened the door and let Austin into the bedroom.  When

11    Keoni opened the door, Austin saw Francesca on the bed, Petitioner leaning on the south

12    wall, Hamilton on the east side of the room, and Wooten on the west side of the room.

13    Austin then saw Wooten put on a condom and sexually assault Francesca while Petitioner

14    and Hamilton kept her legs open and Keoni covered her head with a pillow.  Austin did not

15    see Keoni sexually assault Francesca in the bedroom.  (*Id.*)

16            The appellate court's factual finding that Petitioner engaged in separate acts support

17    its conclusion that "the trial court did not err in imposing consecutive sentences under

18    A.R.S. § 13-116."  (Respondents' Exh. Z at 23)    In reaching that conclusion, the appellate

19    court relied on Arizona law which permits consecutive sentences for multiple violations of

20    the same statute, A.R.S. § 13-1406, which prohibits non-consensual vaginal and anal

21    intercourse, as well as oral sexual conduct.    Arizona courts have found that "[s]o long as the

22    multiple acts of . . . intercourse can be considered separate offenses, nothing prohibits

23    consecutive sentences for those convictions.  To the contrary, A.R.S. section 13-708

24    presumes consecutive sentences are appropriate."  *State v. Williams*, 182 Ariz. 548, 562, 898

25    P.2d 497, 511 (Ariz.Ct.App. 1995), *superseded by rule, on other grounds, as stated in*, *State

26    v. Terrazas*, 187 Ariz. 387, 930 P.2d 464 (Ariz.Ct.App. 1996).  The Court of Appeals also

27    relied on Arizona precedent which permits the imposition of consecutive sentences for each

28    of several sexual acts that a defendant has committed against the same victim during the

1   same assault episode.  (Respondents' Exh. Z at 22-23) (citing *Williams*, 182 Ariz. at 562-64,

2   898 P.2d at 511-13) (upholding the imposition of consecutive sentences for multiple acts of

3   fellatio and intercourse occurring in rapid succession during the same episode) (citing

4   cases).

5          The Arizona Court of Appeals' determination that A.R.S. § 13-116 did not prohibit

6   the imposition of consecutive sentences for Petitioner's convictions on Counts II and III

7   resolves Petitioner's argument that the Arizona statutes did not permit consecutive

8   sentences.  *See Hunter*, 459 U.S. at 368.   Petitioner has not offered evidence or argument

9   sufficient to overcome the presumption of correctness afforded the state court's

10  determination.

11         Moreover, even if Petitioner were able to establish that he held Francesca's leg

12  continuously while Keoni and Wooten sexually assaulted her, he cannot establish a double

13  jeopardy violation.  First, Arizona's accomplice liability statutes do not recognize the

14  distinction that Petitioner has drawn, rather, the statutes view Petitioner as if he had stood in

15  Keoni's and Wooten's place when they raped Francesca.  *See State v. Scott*, 177 Ariz. 131,

16  140, 856 P.2d 792, 801 (Ariz. 1993) ("As the jury was instructed, '[t]he law makes no

17  distinction between the person who directly commits a crime and the person who is an

18  accomplice.'") (citation omitted).  Because Arizona's accomplice-liability statutes treat

19  Petitioner as if he had personally raped Francesca two separate times in quick succession,

20  Arizona law permitted the trial court to impose consecutive sentences for Counts II and III,

21  because, "[e]ach act constituted intercourse as defined by A.R.S. § 13-1401 and each was

22  established with reference to the elements of the other."  *State v. McCuin*, 167 Ariz. 447,

23  449, 808 P.2d 332, 334 (Ariz.Ct. App. 1991), *judgment affirmed in part, vacated on other*

24  *grounds part by*, *State v. McCuin*, 171 Ariz. 171, 829 P.2d 1217 (Ariz. 1992).  Second,

25  Arizona courts defined the "same offense" for double jeopardy purposes, not by the act of

26  the defendant, but by the results of the charged act.  *State v. Burdick*, 211 Ariz. 583, 585,

27  125 P.3d 1039, 1041 (Ariz.Ct.App. 2005).  The sexual assaults underling Counts II and III

28  constituted separate and distinct acts.

1    In short, Petitioner has not shown that the Arizona Court of Appeals' rejection of his

2    Double Jeopardy claim is based on an unreasonable determination of the facts, or that it is

3    contrary to, or rests on an unreasonable application of, federal law. 28 U.S.C. § 2254.

4    **C.  Grounds II(A) and II(B)**

5    In Ground II(A), Petitioner argues that the trial court erred by not permitting

6    Petitioner to call Andre Hamilton into court to be viewed by the jury.  (Doc. 1 at 6)   In

7    Ground II(B), Petitioner argues that the trial court improperly "refused to declare a mistrial

8    or impose other appropriate sanctions against the State (prosecutors) for their (mis)conduct

9    which resulted in the loss of Hamilton's exculpatory testimony at trial." (Doc. 1 at 6)   As

10   discussed below, Petitioner has not shown that the state court's rejection of these claims was

11   contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. §

12   2254.

13   **a.  Relevant Background**

14   In exchange for reduced sentences, Hamilton pled guilty to two charges (kidnapping

15   and attempted sexual assault), pursuant to a plea agreement that required him to testify at

16   Petitioner's trial.  (Respondents' Exh. A, Item 175; Exh. F, Tr. 4/12/05 at 37-38)   Based on

17   Hamilton's post-arrest and "free-talk" interviews, the State anticipated that Hamilton would

18   testify that: (1) he was present at Billy's house when Francesca as sexually assaulted; (2)

19   Petitioner had accompanied him to Billy's house on Tuesday morning; (3) Hamilton realized

20   from Francesca's bruises that she had been beaten; (4) Petitioner told Hamilton he had sex

21   with Francesca that morning; (5) Hamilton saw Petitioner have oral sex with Francesca; and

22   (6) Hamilton saw Petitioner take Francesca to the bathroom and heard punching sounds

23   emanating from that room.  (Respondents' Exh. F, Tr. 4/12/05 at 37-38; Exh. N, Tr. 4/29/05

24   at 14-16, 21-22)

25   On March 10, 2005, Petitioner's defense counsel conducted a tape-recorded interview

26   of Hamilton.  (Respondents' Exh. A, Items 125, 175; Exh. J, Tr. 4/20/05 at 4-10; Exh. L, Tr.

27   4/25/05 at 4-6; Eh. M, Tr. 4/26/05 at 4)   During the interview, Hamilton contradicted

28   statements that he had previously made to the State by alleging that the following events had

1   occurred: (1) on Tuesday morning, Petitioner, Wooten, Hamilton, and King had consensual

2   sex with Francesca; (2) the men did not have group sex with Francesca, but waited their turn

3   outside the bedroom; (3) before Hamilton and Francesca had sex, Francesca voluntarily

4   removed her clothing; and (4) Hamilton did not actually see Petitioner enter the bedroom,

5   but later heard that Petitioner had sex with Francesca.  (Respondents' Exh. A, Item 175; Tr.

6   3/10/05 at 20-23, 30-34, 36-38, 42-44, 48)

7       On April 18, 2005, Deputy County Attorney Baker interviewed Hamilton, in the

8   presence of his attorney, Germann Salazar, to prepare his trial testimony.  (Respondents'

9   Exh. A, Items 125, 128; Exh. J, Tr. 4/20/05 at 3-10; Exh. M, Tr. 4/26/05 at 4-5).   Baker was

10  surprised when Hamilton gave a version of the events that differed from his pre-trial free-

11  talk.  (Respondents' Exh. A, Item 128 at 102; Exh. L, Tr. 4/25/05 at 6-8; Exh. M, Tr.

12  4/26/05 at 14-15, 19)   Hamilton essentially repeated to Baker what he had told Petitioner's

13  counsel during the March pretrial interview, however, he alleged that he had actually seen

14  Petitioner in the bedroom - which differed from his statement in March that he had only

15  heard that Petitioner had sex with Francesca.  (Respondents' Exh. M, Tr. 4/26/05 at 6-7;

16  Exh. N., Tr. 4/29/05 at 15)

17      On April 19, 2005, the prosecution advised Petitioner that the State no longer

18  intended to call Hamilton and would be moving with withdraw from Hamilton's plea

19  agreement.  (Respondents' Exh. M, Tr. 4/26/05 at 4-5)   The next day, the prosecution

20  informed the trial court that it intended to withdraw from Hamilton's plea agreement

21  because of his statements during Baker's trial preparation session and stated that it's

22  decision not to call Hamilton during trial was due to credibility concerns.  (Respondents'

23  Exh. J, Tr. 4/20/05 at 3-4, 7-10)

24      On April 25, 2005, Petitioner filed a motion for any exculpatory evidence that

25  Hamilton had disclosed during Baker's pre-trial interview.  (Respondents' Exh. A, Item 125;

26  Exh. L, Tr. 4/25/05 at 3)   Petitioner reported that Hamilton's claim of consensual sex with

27  Francesca on Tuesday morning was "not new news" because Hamilton had made this

28  assertion during his defense interview; Petitioner provided the court with a transcript of the

1   March pretrial interview.  (Respondents' Exh. L, Tr. 4/25/05 at 4, 8-9)  Petitioner stated that

2   Hamilton's attorney, Salazar, was unwilling to be interviewed because of the State's

3   threatened motion to withdraw from Hamilton's plea agreement.  (*Id*. at 5) The court

4   scheduled a hearing the next day to consider the issue of Hamilton's testimony.  (*Id*. at 8)

5          On April 26, 2005, Petitioner's defense counsel argued the State had untimely

6   disclosed the statements that Hamilton had made to Deputy County Attorney Baker, despite

7   the fact that defense counsel rejected Baker's offer to recite Hamilton's statements to

8   defense counsel in open court six days earlier.  (Respondents' Exh. J, Tr. 4/20/05 at 9-10;

9   Exh M, Tr. 4/26/05 at 3-6, 17)   The State avowed that Hamilton's statements to Baker were

10   substantially the same as those that Hamilton made to defense counsel on March 10, 2005,

11   with the exception of Hamilton's assertion that he had actually seen Petitioner entering the

12   bedroom to have sex with Francesca.  (Respondents' Exh. M, Tr. 4/26/05 at 6-7)   Salazar

13   refused to answer any questions regarding Hamilton's statements to Baker because he

14   deemed that to be privileged as a result of the State's threat to withdraw the plea agreement.

15   (*Id*. at 8-10, 14-15)   Although the State reported the Petitioner could call Hamilton as a

16   defense witness, the court suspended the trial, ordered the State to file a formal motion to

17   withdraw from Hamilton's plea agreement, and scheduled a hearing for April 29, 2005.  (*Id*.

18   at 13-25)

19          On April 27, 2005, the prosecutor informed the trial court and defense counsel by e-

20   mail that the State had decided not to withdraw from Hamilton's plea agreement, stated that

21   Petitioner could call Hamilton as a defense witness, stated that Salazar was willing to

22   disclose Hamilton's statements to Baker, and stated that Salazar would also allow Petitioner

23   to re-interview Hamilton.  (Respondents' Exh. A, Item 168)   The State also filed a formal

24   response to Petitioner's discovery request, in which it affirmed that Hamilton's statements to

25   Baker, with the exception referenced above, were identical to those that Hamilton made

26   during the defense interview conducted by Petitioner's counsel on March 10, 2005.

27   (Respondents' Exh. A, Item 128)

28

1    At the next scheduled hearing, Salazar and Baker reaffirmed their willingness to

2    participate in defense interviews about Hamilton's mid-trial statements.  (Respondents' Exh.

3    N, Tr. 4/29/05 at 4-5)   Additionally, both the State and Salazar advised Deputy Legal

4    Defender Cleary that he could call Hamilton on Petitioner's behalf as trial.  (*Id.* at 4-5, 8)

5    Defense counsel expressed concern about the degree to which "the State used its powers that

6    it has with Mr. Hamilton because of this plea agreement, holding it over his head to get him

7    to say things he didn't tell us before."  (*Id.* at 7)

8    Defense counsel characterized Hamilton as "a witness that has been so damaged for

9    any purpose by the State's [threat] to withdraw from the plea," and opined that Hamilton has

10    "been so manipulated . . . by the State and their threats," that the prosecution "ended up

11    destroying exculpatory evidence for [Petitioner]."  (Respondents' Exh. N, Tr. 4/29/05 at 7-8)

12    Defense counsel also wondered aloud whether Hamilton planned to invoke his Fifth

13    Amendment privilege at trial.  (*Id.* at 8-9)   Arguing that he couldn't "draw from [Hamilton]

14    the exculpatory information he had provided . . . at the [March 10, 2005] interview" because

15    of "prosecutorial misconduct," defense counsel requested various sanctions, including

16    declaring a mistrial.  (*Id.* at 11-13, 19-20)

17    In response, the State explained that it had decided not to withdraw from Hamilton's

18    plea agreement for the purpose of permitting Petitioner to call Hamilton himself.

19    (Respondents' Exh. N. Tr. 4/29/05 at 13-14)   The State told the court that: (1) both parties

20    could impeach Hamilton with his prior inconsistent statements, because Hamilton changed

21    his story several times; (2) some of Hamilton's prior statements incriminated Petitioner,

22    including his allegation that Petitioner had oral sex with Francesca and raped her in the

23    bathroom; (3) the State "never said one word to Mr. Hamilton about his ability to plead" the

24    Fifth Amendment privilege, if he were called as a witness at Petitioner's trial; (4)

25    Hamilton's plea agreement required him to testify truthfully regardless of which party called

26    him; and (5) the State could not revoke the plea agreement if Hamilton ultimately testified

27    for Petitioner.  (*Id.* at 13-17, 21-22)

28

1    The trial court denied Petitioner's requests for sanctions ruling that: (1) the State

2  immediately disclosed to defense counsel the exculpatory statements that Hamilton made to

3  Baker on April 19, 2005, and also offered to relate these statements to defense counsel in

4  open court the following day; (2) the State had fully complied with Petitioner's motion for

5  disclosure of exculpatory evidence; and (3) Petitioner could interview Salazar and Hamilton

6  after the hearing, with the prosecutor and case agent present, "in case there's as dispute as to

7  what has been said." (*Id*. at 22-24)    When defense counsel announced his intention to call

8  Hamilton to testify on Petitioner's behalf, the court rescinded its ruling allowing the State's

9  representatives to attend defense counsel's interview of Hamilton.  (*Id*. 24-28)

10    Two days after Petitioner's trial resumed, the trial court asked defense counsel Cleary

11  whether he needed a court order to secure Hamilton's presence to testify in the defense's

12  case.  (Respondents' Exh. P, Tr. 5/3/05 at 170)  Cleary responded that he was "having

13  problems" with Hamilton, and did not request Hamilton's appearance the next day.  (*Id*. at

14  171)  Cleary did have Hamilton transported to court on May 9, 2005.  (Respondents' Exh.

15  R, Tr. 5/9/05 at 3-7)  Cleary informed the parties and Hamilton's lawyer that he did not plan

16  to elicit any testimony from Hamilton, but instead intended to bring Hamilton into the

17  courtroom and to ask Detective Shumaker to make an in-court identification of Hamilton

18  before the jury.  (*Id*. at 7-8)  The State asked whether Hamilton intended to invoke his

19  privilege against self-incrimination during any prosecutorial cross-examination.  (*Id.*)  The

20  State also objected to producing Hamilton for an in-court viewing because Hamilton's

21  appearance was not an issue.  (*Id*. at 8, 12-13)

22    In response to the State's objections and request to cross-examine Hamilton, defense

23  counsel told that court that he has spoken with Hamilton on April 29, 2005 and that he had

24  learned that Hamilton did not remember a lot and he didn't want to testify.  "He never

25  asserted the Fifth.  He just said he didn't want to testify." (*Id*. at 11)  Before resting his case

26  later that day, Petitioner never called Hamilton to the stand to determine whether he would

27  invoke his privilege against self-incrimination.  (*Id*. at 12-15, 72)

28

1    On appeal, Petitioner argued that the trial court should have granted a mistrial or

2 otherwise sanctioned the State because the prosecution had deprived him of his Sixth and

3 Fourteenth Amendment right to compulsory process and to present exculpatory evidence, by

4 threatening to withdraw from the plea agreement, which Petitioner argued prompted

5 Hamilton to invoke his Fifth Amendment privilege to remain silent.  Petitioner also

6 challenged the trial court's order denying his request to have the jury view Hamilton.

7 (Respondents' Exh. Y, at 18-24)

8    The Arizona Court of Appeals found no prosecutorial misconduct and rejected

9 Petitioner's claims.   (Respondents' Exh. Z at 11-15)   The court found that:

10    [T]he prosecutor had the right to enter the plea agreement with Hamilton in
     an effort to obtain his truthful testimony . . . .  Second, after the prosecutor
11    indicated that she would not seek to withdraw from the plea agreement but
     would not call Hamilton as a witness, the prosecutor agreed to all of
12    [Petitioner's requests for disclosure.  Finally, Hamilton did not intend to assert
     his Fifth Amendment privilege at trial, so defense counsel could have called
13    him to testify.  However, because Hamilton's pre-trial statements were
     inconsistent and he therefore may have lacked credibility as a witness, defense
14    counsel chose merely to have him identified by Detective Shumaker.   There is
     nothing in the record to suggest that, but considering whether to withdraw
15    from the plea agreement, the prosecutor "damaged' the credibility of a witness
     who was already inconsistent in his statements, uncooperative and reluctant to
16    testify.

17    The record does not show that the prosecutor engaged in misconduct
     regarding any agreement.  The trial court did not err in refusing to grant a
18    mistrial or to impose sanctions.

19 (Respondents' Exh. Z)   The Court will consider Grounds II(A) and (B) in view of the

20 foregoing background.

21    **b. Ground II(A)**

22    In Ground II(A), Petitioner argues that the trial court violated his Fifth, Sixth, and

23 Fourteenth Amendment rights by denying Petitioner's requests to "call Andre Hamilton into

24 court to be viewed by the jury." (Doc. 1 at 6)   As set forth below, Petitioner is not entitled

25 to habeas corpus relief on this claim.

26    Both Hamilton and that State objected to Petitioner's request to call Hamilton at trial

27 simply to be viewed by the jury.  (Respondents' Exh. K, Tr. 5/9/05 at 3-8)  Hamilton

28 objected on relevance grounds and argued that Petitioner had not complied with

1    Ariz.R.Crim.P. 35.  The State argued that such an in-court presentation was cumulative and

2    irrelevant because the jury already had "photographs in evidence" and Hamilton did not

3    have any distinct features, such as a tattoo.  (*Id*. at 4, 8)   The trial court denied Petitioner's

4    request finding that an in-court presentation would be irrelevant and cumulative, noting that

5    "with the other witnesses there was something unique with regard to the tattoo and

6    placement of a tattoo . . . There's nothing unique about Mr. Hamilton."  (Respondents' Exh.

7    R, Tr., 5/9/05 at 12-13)   The Court of Appeals summarily denied relief on his claim.

8         Petitioner is not entitled to federal habeas corpus relief on Ground II(A) which

9    essentially challenges the trial court's determination that a show-up was irrelevant and

10   cumulative under Arizona evidentiary rules.  *See* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at

11   67-68 (stating that "it is not the province of a federal habeas court to re-examine state court

12   determinations of state law questions.").

13        Moreover, the trial court's finding that an in-court presentation of Hamilton was

14   irrelevant and cumulative did not violate Petitioner's federal constitutional right to present

15   defense evidence.  The Supreme Court has held that "trial judges retain wide latitude insofar

16   as the Confrontation Clause is concerned to impose reasonable limits on cross-examination

17   based on concerns about, among other things, harassment, prejudice, confusion of the issues,

18   the witness' safety, or interrogation that is repetitive or only marginally relevant.").  The

19   presentation of Hamilton was not necessary to Petitioner's misidentification defense

20   because: (1) Austin, who knew that Hamilton went by the names "Dre" or "Drew," referred

21   to the man who raped Francesca in the bathroom on Tuesday by the names "ATL" or

22   "Woo;" and (2) Petitioner relied upon Austin's nomenclature to argue that either Wooten

23   ("Woo") or King ("ATL") had committed the sexual assault in the bathroom.  (Respondents'

24   Exh. O, Tr. 5/2/05 at 26-30, 51-52, 109, 129-33; Exh. P, Tr. 5/3/05 at 61-62, 75076, 106-09,

25   137; Exh. Q, Tr. 5/4/05 at 14-16, 75-76, 87-89; Exh. S, Tr. 5/10/05 at 61-62, 65-67, 75)

26   Indeed, Petitioner never argued that the State's witnesses had mistakenly attributed any of

27   Hamilton's criminal conduct to Petitioner.

28

Moreover, Hamilton's involvement in the charged offenses was not an issue at Petitioner's trial. Rita, Keoni, and Wooten gave testimony regarding Hamilton's participation in the sexual assaults on Francesca. (Respondents' Exh. F, Tr. 4/12/05 at 113-20, Exh. G, Tr. 4/13/05 at 42; Exh. H, Tr. 4/14/05 at 24, 32, 52, 62-74, 91-92; Exh. K, Tr. 4/21/05 at 89, 108-09, 120-27, 137-38; Exh. L, Tr. 4/25/05 at 38; Exh. O, Tr. 5/2/05 at 26-39, 53-54, 132-33). Additionally, Austin and Vanessa positively identified Hamilton from photo arrays that police prepared and showed to them. (Respondents' Exh. J, Tr. 4/20/05 at 122-33; Exh. L, Tr. 4/25/05 at 75-76, 95. Exh. O, Tr. 5/2/05 at 50-51, 140-44) Finally, the jury already had photographs of Hamilton admitted into evidence because the State's trial exhibits included the photo-lineups from which its witnesses has identified Hamilton, as well as the single-image photograph of Hamilton that the police showed to Austin at a later date, and which the prosecutor showed Rita and Wooten at trial to identify Hamilton. (Respondents' Exh. F, Tr. 4/12/05 at 116-118, Exh. H. Tr. 4/14/05 at 24; Exh. L, Tr. 4/25/05 at 76, 95; Exh. O, Tr. 5/2/05 at 27-28, 30, 142-44; Exh. Q, Tr. 5/4/05 at 11-16)

In summary, Petitioner has not shown that the state court's rejection of his claim asserted in Ground II(A) was contrary to, or an unreasonable application of, federal law.

### c. Ground II(B)

In Ground II(B), Petitioner argues that the trial court improperly "refused to declare a mistrial or impose other appropriate sanctions against the State (prosecutors) for their (mis)conduct which resulted in the loss of Hamilton's exculpatory testimony at trial." (Doc. 1 at 6) Petitioner raised this claim on direct appeal arguing that the State's threat to withdraw Hamilton's plea agreement constituted prosecutorial misconduct which violated Petitioner's Sixth Amendment right to present defense witnesses, based on Hamilton's alleged invocation of his Fifth Amendment privilege and refusal to testify at trial. The Court of Appeals denied relief on Ground II(B). (Respondents' Exh. Z at 11-15) Petitioner has not shown that he is entitled to habeas corpus relief on this claim. The Court will consider the law governing prosecutorial misconduct and compulsory process because Ground II(B) raises both issues.

On habeas corpus review, the standard of review for claims of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is that fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (stating that the "aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'") (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  The relevant question is "whether the prosecutors' [alleged misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643)).

The Supreme Court has indicated that a petitioner alleging prosecutorial misconduct is not entitled to relief unless he establishes: (1) that the prosecutor's "actions amounted to 'misconduct;'" and (2) that "such misconduct resulted in actual prejudice to petitioner, such that his trial was rendered 'fundamentally unfair.'" *Woods v. Adams*, 631 F.Supp.2d 1261, 1279 (C.D.Cal. 2009) (citing *Donnelly*, 416 U.S. at 637-38).  "Prosecutorial misconduct which rises to the level of a due process violation may provide the grounds for granting a habeas petition only if that misconduct is deemed prejudicial under the 'harmless error' test articulated in *Brecht v. Abrahamson*." *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (citing *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002)).

The Sixth Amendment's Compulsory Process Clause gives a criminal defendant the "right to offer the testimony of witnesses, to compel their testimony, if necessary," as part of a defendant's broader "right to present a defense," which is "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  The right, however, is not absolute and must accommodate other legitimate interests in the criminal process.  *See Michigan v. Lucas*, 500 U.S. 145, 152-53 (1991) (rejecting defendant's Sixth Amendment challenge to Michigan's rape-shield statute's notice-and-hearing prerequisite for admission of victim's prior consensual sexual activity because this procedural requirement "serves

1   legitimate state interests in protecting against surprise, harassment, and undue delay.");

2   *Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (upholding preclusion of defense witnesses

3   disclosed after the prosecution had rested, despite arguments that preclusion violated the

4   accused's right to compulsory process.).

5           Supreme Court cases regarding the Sixth Amendment's Compulsory Process Clause

6   have borrowed from cases involving the Fifth Amendment's Due Process Clause.  *United*

7   *States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982).  Thus, when a defendant alleges a

8   violation of his Sixth Amendment right to compulsory process, "the Court must consider

9   whether he has made [the same] showing of materiality" that the Supreme Court requires

10  defendants to establish in the context of the Fifth Amendment's Due Process Clause.  *United*

11  *States v. Bianchi*, 594 F.Supp.2d 532, 544-45 (E.D.Pa. 2009).  The Supreme Court has

12  defined "materiality" as "a reasonable probability that . . . the result of the proceeding would

13  have been different.  A 'reasonable probability' is a probability sufficient to undermine

14  confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Thus, in

15  the context of a compulsory process claim, "more than the mere absence of testimony is

16  necessary to establish a violation of the right [to compulsory process]."  *Valenzuela-Bernal*,

17  458 U.S. at 867 (citing *Washington*, 388 U.S. at 16).   The petitioner "must at least make

18  some plausible showing of how [the unavailable] testimony would have been both material

19  and favorable to his defense."  *Valenzuela-Bernal*, 458 U.S. at 867.

20          **2.  Analysis of Ground II(B)**

21          As stated above, the Arizona Court of Appeals found that the State's conduct related

22  to Hamilton did not constitute prosecutorial misconduct resulting in a violation of

23  Petitioner's Sixth Amendment right to compulsory process, and that defense counsel's

24  tactical decision was the reason that Hamilton, who had given inconsistent statements and

25  lacked credibility, never took the stand as a defense witness.  (Respondents' Exh. Z at 14)

26  On habeas corpus review, this Court must grant a substantial measure of deference to the

27  state court's decision denying relief on Petitioner's claim of prosecutorial misconduct

28  because the standard governing that issue is a "general rule."  *Renico*, 130 S.Ct. at 1864;

1 | *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645)

2 | (stating that the standard governing prosecutorial misconduct "is necessarily imprecise.").

3 |      The Arizona Court of Appeals reasonably concluded that the State did not engage in

4 | prosecutorial misconduct by securing Hamilton's testimony against Petitioner pursuant to a

5 | plea agreement that reduced his potential sentence in exchange for truthful testimony.

6 | "'The general rule is that an accomplice who has pled guilty may testify against non-

7 | pleading defendants without raising due process concerns.'"  *Morris v. Woodford*, 273 F.3d

8 | 826, 836 (9th Cir. 2001) (quoting *United States v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir.

9 | 1988) (stating that "a plea agreement may require an accomplice to testify fully and

10 | truthfully without violating the Due Process Clause.").

11 |      Additionally, the prosecution did not engage in misconduct when it threatened to

12 | withdraw from Hamilton's plea agreement after discovering that he had deviated from his

13 | earlier statements which raised concerns regarding Hamilton's credibility as a witness.

14 | When an accomplice who has agreed to testify against the defendant breached the

15 | truthfulness provision of his plea agreement, the prosecution may move to withdraw from

16 | the agreement, reinstate the original charges, and bring the witness to trial.  *Hentz v. Hargett*,

17 | 71 F.3d 1169, 1175-76 (5th Cir. 1996).   Arizona law did not require the court's authorization

18 | for the State to withdraw from its plea agreement with Hamilton based on his inconsistent

19 | pre-trial statements, because the court had not yet accepted Hamilton's guilty plea.

20 | (Respondents' Exh. L, Tr. 4/25/05 at 142); *State v. Superior Court*, 160 Ariz. 71, 71-72, 770

21 | P.2d 375, 375-76 (Ariz.Ct.App. 1988) (citing Ariz.R.Crim.P. 17.4(b)).

22 |      Regardless, the State ultimately did not withdraw from its plea agreement with

23 | Hamilton, and announced in open court that the plea agreement did not prohibit Petitioner

24 | from interviewing Hamilton and calling him as a witness.  Additionally, the State disclosed

25 | the statements Hamilton had made to Deputy County Attorney Baker during their pre-trial

26 | preparation session on April 18, 2005.  (Respondents' Exh. A, Item 128; Exh. N, Tr. 4/29/05

27 | at 4-5, 8, 13-17, 21-24)   The Court of Appeals concluded that the State did not commit

28 | prosecutorial misconduct.  (Respondents' Exh. Z at 12-14)   Additionally, the prosecutor's

1    actions ensured that Petitioner could call Hamilton as a witness without concern that he

2    would tailor his testimony to keep his favorable plea agreement with the State.  *See United*

3    *States v. Terzado-Madruga*, 897 F.2d 1099, 1108-09 (11th Cir. 1990) (finding no

4    governmental interference with government witnesses because the plea agreement permitted

5    them to testify for the defendant, and the prosecutor cured the case agent's improper

6    statements discouraging the witnesses from meeting with the defense investigator by telling

7    them that such a meeting was permissible.).

8            The Court will next consider Petitioner's assertion in Ground II(B) that the alleged

9    prosecutorial misconduct resulted in a violation his Sixth Amendment right to compulsory

10   process.  Petitioner essentially argues that the prosecutor's interference with their own

11   witness, Hamilton, violated Petitioner's Sixth Amendment right to compulsory process.  The

12   Arizona Court of Appeals rejected this claim.  (Respondents' Exh. Z at 12-15)

13           Petitioner has not established that the State court's determination was contrary to, or

14   an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).

15   Supreme Court cases concerning compulsory process, involve governmental interference

16   with defense witnesses.  *See Webb v. Texas*, 409 U.S. 95, 98 (1972) (concluding "that the

17   judge's threatening remarks, directed only at the single witness for the defense, effectively

18   drove that witness off the stand, and thus deprived the petitioner of due process of law under

19   the Fourteenth Amendment."); *Washington*, 388 U.S. at 19 (invalidating a Texas statute

20   categorically prohibiting a defendant from calling his accomplices and co-defendants at

21   trial).  The Ninth Circuit had noted that it is "an open question" whether *Webb* applies to

22   prosecution witnesses, such as Hamilton in this case.   *United States v. Vavages*, 151 F.3d

23   1185, 1191 n. 1 (9th Cir. 1998).  The Supreme Court has explained that if habeas corpus

24   relief depends on the resolution of an "open question in [Supreme Court] jurisprudence,' §

25   2254(d)(1) precludes relief."  *Crater v. Galaza*, 491 F.3d 1119, 1123 (9th Cir. 2007) (quoting

26   *Musladin*, 549 U.S. at 76) (stating that "[g]iven the lack of holdings from this Court

27   regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind

28   involved here, it cannot be said that the state court 'unreasonably applied clearly established

federal law.'"); *see Musladin*, 549 U.S. at 76-77 (noting the division among lower courts on an issue never resolved by the Supreme Court as a basis for holding that the state court of appeals' rejection of a claim was not contrary to, or an unreasonable application of clearly established federal law.).

Regardless of the absence of clearly established federal law on the precise issue before the Court, Petitioner's compulsory process argument fails because, contrary to Petitioner's assertion, Hamilton never invoked his Fifth Amendment privilege against self-incrimination. (Respondents' Exh. Z at 14)   Petitioner bases his assertion that Hamilton invoked the Fifth Amendment on defense counsel's statement to the trial court that, Hamilton "isn't going to say anything, and the problem I think is because of what went on last week and what he heard, but he's an 18, 19, 20-year-old kid.   You now, Mr. Salazar's had problems with him.  Obviously, the State's had problems with him.  Now I'm having problems with him." (Respondents' Exh. P, Tr. 5/3/05 at 170)   The record supports the appellate court's determination that Hamilton never invoked his Fifth Amendment privilege.  Petitioner's counsel told the court that Hamilton never invoked his Fifth Amendment privilege and answered questions during his private trial preparation interview on April 29, 2005. (Respondents' Exh. R, Tr. 5/9/05 at 11)   Neither Hamilton nor his attorney ever informed the court that he intended to invoke the Fifth Amendment and refuse to answer questions if Petitioner called him to testify.  (*Id*. at 15; Exh. N, Tr. 4/29/05 at 4-8, 23-27)

Additionally, the record reflects that Hamilton did not testify on Petitioner's behalf, not because of the prosecution's conduct, but because defense counsel made a tactical decision not to call him as a witness because he was uncooperative and had credibility issues.  Indeed, Hamilton and his attorney were present in the courtroom and Hamilton was prepared to be called to the stand on the last day of the defense's case. (Respondents' Exh. R, Tr. 5/9/05 at 2-8)   The record supports the Arizona Court of Appeals' finding that Petitioner's defense counsel, Mr. Cleary, decided not to call Hamilton as a defense witness because of Hamilton's inconsistent pretrial statements and his resulting lack of credibility. (Respondents' Exh. Z at 14)    After interviewing Hamilton, Cleary informed the court that

1    he was experiencing the same difficulties with Hamilton that the prosecution and Salazar

2    had encountered with Hamilton.  (Respondents' Exh. P, Tr. 5/3/05 at 170)   Moreover, even

3    if Cleary had called Hamilton as a witness, the State could have damaged Hamilton's

4    credibility and offer additional evidence of Petitioner's guilt by impeaching Hamilton with

5    his numerous prior inconsistent statements.  (Respondents' Exh. J, Tr. 4/2/05 at 9; Exh. N,

6    Tr. 4/29/05 at 14-16, 21-22; Exh. R, Tr. 5/9/05 at 8)

7          In view of the foregoing, Petitioner is not entitled to habeas corpus relief on Ground

8    II(B)

9          **D.  Ground II(E)**

10          In Ground II(E), Petitioner argues that the trial court "erroneously refused to instruct

11    the jury on [sexual assault's] lesser-included offense of sexual abuse" on Count 2 because "it

12    was inconclusive whether Wooten or [Petitioner] ever penetrated the victim."  (Doc. 1 at 6)

13    On direct appeal, Petitioner argued that the denial of this lesser-included offense jury

14    instruction violated the Fifth, Sixth, and Fourteenth Amendments.  (Respondents' Exh. Y at

15    29)  The Arizona Court of Appeals rejected this argument, finding that the evidence did not

16    support the requested instruction.  (Respondents' Exh. Z at 18-20)   As discussed below,

17    Petitioner is not entitled to habeas corpus relief on this claim.

18          First, under § 2254, habeas corpus relief is not available unless the state court

19    decision was contrary to, or an unreasonable application of, clearly established federal law.

20    "Where the Supreme Court has not addressed an issue in its holding, a state court

21    adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an

22    unreasonable application of, clearly established federal law."  *Stenson v. Lambert*, 504 F.3d

23    873, 881 (9th Cir. 2007).  *See also Wright v. Van Patten*, 552 U.S. 120, 124-26 (2008).   This

24    rule applies here because "the Supreme Court has never held that there is a constitutional

25    requirement that lesser-included offense instructions be given in non-capital cases."  *Carney*

26    *v. Fabian*, 487 F.3d 1094, 1097 (8th Cir. 2007).   Although the Supreme Court has held that

27    the Constitution requires trial courts in capital cases to instruct the jury on all lesser-included

28    offenses which the evidence supports, the Supreme Court has not extended that holding to

1   non-capital cases. *Beck v. Alabama*, 447 U.S. 625, 637 (1980); *see Bobby v. Mitts*, __ S.Ct.

2   ___, 2011 WL 1631037 (May 2, 2011) (discussing *Beck*).   The Supreme Court has

3   emphasized that the rule it announced in *Beck* only applies to capital murder cases.  *Id*.

4   After acknowledging that it has "never held that a defendant is entitled to a lesser-included

5   offense instruction as a matter of due process," 447 U.S. at 637, the Court indicated that this

6   precedent remained intact in non-capital cases stating that, "[w]e need not and do not decide

7   whether the Due Process Clause would require the giving of such instructions in a non-

8   capital case."  *Beck*, 447 U.S. at 638 n. 14.   Supreme Court decisions after *Beck* have

9   clarified that *Beck* was based on the Eighth Amendment, not the Due Process Clause, and

10  have left open the question of whether the Due Process Clause requires state trial courts to

11  give lesser-included offense instructions in non-capital cases.  *See Hopper v. Evans*, 456

12  U.S. 605, 611 (1982) (stating that "[o]ur holding in *Beck*, like our other Eighth Amendment

13  decisions of the past decade, was concerned with insuring that sentencing discretion in

14  capital cases is channeled so that arbitrary and capricious results are avoided.");  *Howell v.*

15  *Mississippi*, 543 U.S. 440, 444-45 (2005).

16         In view of the foregoing Supreme Court precedent, numerous circuit courts, including

17  the Ninth Circuit, have concluded that the Supreme Court has left open the question of

18  whether the *Beck* rule applies to non-capital cases.  *See Tiger v. Workman*, 445 F.3d 1265,

19  1268 (10th Cir. 2006); *Scott,* 302 F.3d at 606; *Solis v. Garcia*, 219 F.3d 922, 928-929 (9th Cir.

20  2000); *Jones v. Hoffman*, 86 F.3d 46, 48 (2nd Cir. 1996); *Tata v. Carver*, 917 F.2d 670, 71

21  (1st Cir. 1990).   Because the issue of whether the *Beck* rule applies in non-capital cases had

22  not been resolved by the United States Supreme Court when Petitioner's case was decided

23  on direct review, the Arizona Court of Appeals' denial of Ground II(E) was not contrary to,

24  or an unreasonable application of the then-existing, clearly established Supreme Court law.

25  *Van Patten*, 552 U.S. at 24-26; *Musladin*, 549 U.S. at 77; *Garcia-Espitia*, 546 U.S. at 10.

26         Moreover, lower federal courts have held that "the failure of a state trial court to

27  instruct on a lesser-included offense in a non-capital case does not present a federal

28  constitutional question."  *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) (citing

1    *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995)).   These cases reason that the propriety

2    of a lesser-included offense instruction is a state-law question over which federal habeas

3    courts have no jurisdiction.   *See Bland v. Sirmons*, 459 F.3d 999, 1016-17 (10th Cir. 2006);

4    *Green v. Groose*, 959 F.2d 708, 709 (8th Cir. 1992).   The "majority of circuits considering

5    this difficult issue have held that the failure of a state court to instruct on a lesser included

6    offense in a non-capital case never raises a federal constitutional question." *Pitts v.*

7    *Lockhart*, 911 F.2d 109, 112 (8th Cir. 1990).   The Ninth Circuit subscribes to the majority

8    view that federal habeas corpus relief is unavailable for this type of claim. *James v. Reese*,

9    546 F.2d 325, 327 (9th Cir. 1976).

10            In view of the foregoing, Petitioner is not entitled to relief on Ground II(E).

11   Accordingly, the Court declines that address Respondents' alternative argument that, even if

12   the trial court was constitutionally required to give a lesser-included offense instruction on

13   sexual abuse, Petitioner is not entitled to habeas corpus relief because he cannot meet the

14   required showing of prejudice.  (Doc. 12 at 117-123)

15            **E.  Ground III**

16            In Ground III, Petitioner argues that trial counsel rendered ineffective assistance

17   because he did not move to preclude the State from offering evidence of Billy's and Rita's

18   conduct towards Francesca which occurred outside of Petitioner's presence and without his

19   knowledge.  (Doc. 1 at 7)   Petitioner argues that this "horrific" evidence caused the jury to

20   convict him on all counts and to find the aggravating circumstance that the offenses were

21   "especially cruel, heinous, or depraved."  (Doc. 1 at 7)   Petitioner raised this claim on post-

22   conviction review.  (Respondents' Exh. EE)   The post-conviction court rejected this

23   argument and concluded that Petitioner's defense counsel provided effective assistance.

24   (Respondents' Exh. GG)  As set forth below, Petitioner has not shown that this

25   determination was contrary to, or an unreasonable application of, clearly established federal

26   law.

27            The controlling Supreme Court precedent on claims of ineffective assistance of

28   counsel is *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail upon a claim of

1  ineffective assistance of counsel, petitioner must show that: (1) counsel's performance was

2  deficient; and that (2) counsel's deficient performances prejudiced petitioner. *Strickland*,

3  466 U.S. at 687-94.  Under the first prong, to be deficient, counsel's representation must

4  have fallen "below an objective standard of reasonableness." *Strickland*, 466 U. S. at 688.

5  There is a "strong presumption" that counsel's representation is within the "wide range" of

6  reasonable professional assistance.  *Id.* at 689; *see also Kimmelman v. Morrison*, 477 U.S.

7  365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).   "A fair assessment of attorney

8  performance requires that every effort be made to eliminate the distorting effects of

9  hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate

10  the conduct from counsel's perspective at the time."  *Bonin*, 59 F.3d at 833 (quoting

11  *Strickland*, 466 U.S. at 689).  "'Surmounting *Strickland's* high bar is never an easy task.'"

12  *Richter*, 131 S.Ct. at 788 (quoting *Padilla v. Kentucky*, __ U.S.___, 130 S.Ct. 1473, 1485

13  (2010)).  "The question is whether an attorney's representation amounted to incompetence

14  under 'prevailing professional norms', not whether it deviated from best practices or most

15  common custom."  *Richter*, 131 S.Ct. at 788 (quoting *Strickland*, 466 U.S. at 690).

16      To succeed on a claim of ineffective assistance, a petitioner must also establish that

17  counsel's deficient performance resulted in prejudice.  *Strickland*, 466 U.S. at 691-92.   To

18  establish prejudice, petitioner must show that "there is a reasonable probability that, but for

19  counsel's unprofessional errors, the result of the proceeding would have been different."

20  *Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to

21  undermine confidence in the outcome. *Id.*   The "potential prejudicial effect of counsel's

22  deficient performance must be evaluated in light of" the strength of the prosecution's case.

23  *Johnson v. Baldwin*, 114 F.3d 835, 838 (9th Cir. 1997).

24       Establishing that a state court's application of *Strickland* was unreasonable under

25  §2254(d) is difficult, because both standards are "highly deferential," 466 U. S. at 689, and

26  because *Strickland's* general standard has a substantial range of reasonable applications.

27  The issue under §2254(d) is not whether counsel's actions were reasonable, but whether

28  there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

1   *Richter*, 131 S.Ct. at 788.  *See also Yarbrough*, 540 U.S. at 6 ("Judicial review of a defense

2   attorney's summation is therefore highly deferential — and doubly deferential when it is

3   conducted through the lens of federal habeas.").

4        Here, Petitioner has not established that trial counsel rendered deficient performance

5   by failing to move to exclude evidence of Billy Watson's and Rita Anthony's conduct

6   during the first night when Petitioner was not present.  The evidence to which Petitioner

7   refers includes Billy repeatedly forcing Francesca to perform fellatio, beating Francesca with

8   a golf club, forcing Francesca to take drugs, strangling her, whipping her legs and buttocks,

9   hog-tying her with electrical cords, forcing her to dance like a stripper, and forcing

10  Francesca to submit to Rita touching her breasts.  (*see*, *supra* pg. 3-4)

11       After Billy and Rita engaged in the foregoing conduct, Billy left and locked

12  Francesca and Rita in the bedroom until the morning.  (Respondents' Exh. F, Tr. 4/12/05 at

13  110-11)  Rita testified that Francesca "laid there like a doll, just limp."  (*Id.*)  When

14  Petitioner, Wooten, Hamilton, and King arrived at Billy's house at 6:00 a.m., they found

15  Francesca naked on Billy's bed, incoherent, and suffering from recent, visible injuries,

16  including abrasions on her neck, dark bruises, and lash marks on her legs.  (Respondents'

17  Exh. H, Tr. 4/14/05 at 36-39, 50)   Additionally, Billy told Petitioner and the others that he

18  had given Francesca LSD, Respondents' Exh. F, TR. 4/14/05 at 138-40, and she appeared

19  disoriented and was mumbling incoherently saying "Bob Marley," "7-Eleven," and

20  "vortex." (*Id.* at 39, 43, 50)   Based upon this evidence, the State argued at trial and on post-

21  conviction review, that evidence of the injuries inflicted on Francesca by Billy and Rita,

22  including photographs of Francesca at the hospital, were admissible to prove that: (1)

23  Francesca was being held against her will; (2) Francesca neither consented, nor had the

24  capacity to consent, to sexual intercourse with Petitioner and his companions; (3) these

25  visible injuries established Petitioner's knowledge that Francesca did not consent to sexual

26  intercourse and was being held against her will.  (Respondents' Exh. D, Tr. 4/8/05 at 44-47;

27  Exh. GG at 4-5)

28

1       On post-conviction review, the trial court denied relief on this claim of ineffective

2   assistance, finding that "[t]he conduct of William Watson and Rita Anthony was intrinsic to

3   the crimes committed by [Petitioner.]" (Respondents' Exh. GG at 1; Exh. HH at 1)   In

4   Arizona, "[o]ther act evidence is 'intrinsic' when evidence of the other act and evidence of

5   the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal

6   episode,' or the other acts were 'necessary preliminaries' to the crime charged." *State v.*

7   *Dickens*, 187 Ariz. 1, 18 n. 7, 926 P.2d 468, 485 (Ariz. 1996) (quoting *United States v.*

8   *Coleman*, 78 F.3d 154, 156 (5th Cir. 1996)).   Intrinsic evidence of third-party conduct is

9   admissible when offered to prove an element of the charged offense.   *State v. Baldenegro*,

10   188 Ariz. 10, 15-16, 932 P.2d 275, 280-81 (Ariz.Ct.App. 1996) (holding that evidence of

11   crimes committed by other gang members was admissible against defendant as "intrinsic"

12   evidence, which was "inextricably intertwined" with the charged offense of assisting and

13   participating in a criminal syndicate for the benefit of a street gang).

14       Because the trial court determined that the challenged evidence was admissible,

15   Petitioner's claim that counsel was ineffective for failing to object to that evidence fails.

16   When a habeas corpus petitioner argues that trial counsel rendered ineffective assistance by

17   failing to object to certain evidence as inadmissible under the state's evidentiary rules, the

18   state court's determination that the evidence at issue would have been properly admitted at

19   trial under state law, establishes that counsel's failure to object was neither deficient

20   performance nor prejudicial for purposes of the Sixth Amendment.   *See Stanley v. Schriro*,

21   598 F.3d 612, 619-20 (9th Cir. 2010) (finding defense counsel was not ineffective for failing

22   to present expert testimony that was inadmissible under Arizona law); *Hebner v. McGrath*,

23   543 F.3d 1133, 1137 (9th Cir. 2008) (rejecting ineffective assistance claim based on trial

24   counsel's failure to object to rape victim's testimony based on California's Evidence Code,

25   where state appellate court ruled that the evidence would have been admitted under a

26   different California rule of evidence.).   Because an objection to Billy's and Rita's testimony

27   regarding their conduct the first night Francesca was kept in Billy's room would have lacked

28

1    merit, defense counsel's failure to object to the admission of that testimony was not

2    constitutionally deficient performance.  *Id.*

3           Moreover, although defense counsel did not file a motion *in limine* to preclude

4    evidence of Billy's and Rita's conduct that occurred outside of Petitioner's presence, at least

5    once during trial, defense counsel objected to Rita's testimony describing Billy's conduct

6    that occurred before Petitioner arrived at the house.  (Respondents' Exh. F, Tr. 4/12/05 at

7    108)  The court overruled the objection.  (*Id.*)   Trial counsel also used other tactics to

8    minimize the impact of Rita's and Billy's testimony and other evidence of conduct by third

9    parties including: (1) moving to preclude photographs depicting Francesca's injuries

10   (Respondents' Exh. D, Tr. 4/8/05 at 44-47); (2) moving to preclude the State's witnesses

11   from using the term "gang bang" and "gang rape" (*Id.* at 48; Exh. E, Tr. 4/9/05 at 3); and

12   (3) arguing that other persons, including Billy and Rita, caused at least some of Francesca's

13   injuries.  (Respondents' Exh. S, Tr. 5/10/05 at 63-64; Exh. U, Tr. 5/12/05 at 57-58)   The

14   admission of evidence regarding Billy's and Rita's conduct also allowed defense counsel to

15   blame Billy and Rita for some of Francesca's injuries and to argue that the jury could not

16   identify beyond a reasonable doubt which injuries Petitioner had caused.  (Respondents'

17   Exh. U, Tr. 5/12/05 at 57-58)

18          Additionally, even if Petitioner could satisfy *Strickland's* performance prong, he has

19   not established that he was prejudiced by the admission of evidence regarding Billy's and

20   Rita's conduct outside of Petitioner's presence.  Even without considering Billy's and Rita's

21   conduct that occurred when Petitioner was not present, there was sufficient evidence to

22   support the jury's verdicts, such that Petitioner cannot establish a reasonable probability that,

23   but for counsel's deficient performance, the outcome of Petitioner's trial would have been

24   different - in other words that the jury would have reached a different conclusion regarding

25   guilt or regarding the aggravating factor of "especially cruel, heinous, or depraved." *See*

26   *Strickland*, 466 U.S. at 687-94.   The record contains the following evidence which supports

27   the jury's guilty verdicts: (1) Petitioner and his companions watched Billy whip Francesca

28   legs, buttocks, and back with a belt; (2) Petitioner and his companions beat Francesca, as

1  supported by Rita's testimony that she heard "slapping noises" and "gross" sounds coming

2  from Billy's bedroom; (3) Francesca's visible injuries and disoriented behavior did not deter

3  Petitioner from beating and raping Francesca; (4) Petitioner "elbowed" Francesca in the face

4  with sufficient force to propel her backward onto the bed, and render her motionless for

5  enough time that others in the room thought she was dead; (5) Petitioner restrained

6  Francesca and "laugh[ed]" while Keoni had non-consensual intercourse with her; (6)

7  Petitioner restrained Francesca while Wooten sexually assaulted Francesca; (7) Petitioner

8  then attacked Francesca by "hitting her in the ribs and her stomach . . . and just pounding

9  her" in the presence of Wooten and the other accomplices; (8) Petitioner dragged Francesca

10  from Billy's bedroom to the bathroom, pushed her head down into the bathtub, "inserted his

11  penis into [her] vagina," "pounded" and "hit her so hard [that] she fell," and strangled her to

12  stifle her screams while Wooten, Hamilton, and Keoni watched from the doorway; (9) after

13  violating Francesca in the bathroom, Petitioner left her slumped on the bathroom floor; (10)

14  the extent and number of Francesca's injuries were so extreme that the forensic nurse

15  examiner and the emergency room doctor who examined her had independent recollection of

16  her almost two years later.  (Respondents' Exh. D, Tr.4/12/05 at 120; Exh. E, Tr. 4/13/05 at

17  24, 36, 91-93, 95, 98, 126, 133, 139-40; Exh. F, Tr. 4/14/05 at 42-44, 50-56, 63-64, 70, 72-

18  74, 134-36, 140, 147048, 151-60; Exh, K, Tr. 4/21/05 at 21, 27-44, 124-34; Exh. L, Tr.

19  4/25/05 at 17, 26, 38l Exh. I, Tr. 5/2/05 at 40-43, 51-52; Exh. P, Tr. 5/3/05 at 60-63, 108-11;

20  Exh. Q, Tr. 5/4/05 at 14-16, 63-65, 71)   Additionally, Petitioner was very muscular, had

21  "broad shoulders," and was described as weighing between 185 and 195 pounds, "a lot

22  bigger than the rest of the guys" who sexually assaulted and beat Francesca. (Respondents'

23  Exh. F, Tr. 4/12/05 at 113-14, 116, 160; Exh. G, Tr. 4/13/05 at 139-40, 144; Exh. H, Tr.

24  4/14/05 at 18-21; Exh. J, Tr. 4/20/05 at 50, 107, 111-13, 125, 127; Exh. K, Tr. 4/21/05 at 90-

25  96; Exh. L, Tr. 4/25/05 at 33-34, 69; Exh. O, Tr. 5/2/05 at 25-28; Exh. Q, Tr. 5/4/05 at 20,

26  47)   In view of the foregoing evidence of Petitioner's participation in sexually assaulting

27  and beating Francesca, Petitioner cannot establish that, but for counsel's failure to object to

28  the admission of evidence regarding the conduct of Rita and Billy that occurred outside of

1   Petitioner's presence, there is a reasonable likelihood that the outcome of the guilt phase

2   would have been different.

3         Petitioner also argues that counsel's failure to object to evidence of Billy's and Rita's

4   conduct that occurred outside of his presence resulted in prejudice because it led to the

5   jury's finding during the sentencing phase that Petitioner's conduct was "especially cruel,

6   heinous, or depraved."  (Doc. 1 at 7)  As an initial matter, the Supreme Court has not

7   specifically extended *Strickland's* requirements to non-capital sentencing proceedings. The

8   *Strickland* Court "expressly declined to 'consider the role of counsel in an ordinary

9   sentencing, which . . . may require a different approach to the definition of constitutionally

10  effective assistance.'" *Cooper-Smith*, 397 F.3d at 1244 (quoting *Strickland*, 466 U.S. at

11  686).  "Moreover, since *Strickland*, the Supreme Court has not delineated a standard which

12  should apply to ineffective assistance of counsel claims in noncapital sentencing cases." *See*

13  *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006) (citing *Cooper-Smith*, 397 F.3d at

14  1244).  Therefore, there is no clearly established federal law as determined by the Supreme

15  Court in the context of non-capital sentencing. *See Cooper-Smith,* 397 F.3d at 1244;

16  *Lambert v. Blodgett*, 393 F.3d 943, 983 (9th Cir. 2004). Thus, the Arizona Court of Appeals'

17  resolution of this issue could not have been an unreasonable application of clearly

18  established federal law. *Id.*

19        Moreover, Petitioner was not prejudiced with regard to the aggravating factor at issue

20  because Judge Ishikawa, who presided over Petitioner's trial, sentencing, and post-

21  conviction proceedings stated that he would have imposed the same sentence even without

22  consideration of the "especially cruel, heinous, or depraved," aggravating circumstance.

23  Judge Ishikawa stated that, "[t]here was more than sufficient aggravating factors present to

24  warrant an aggravated prison term irrespective of the cruel, heinous, and depraved factor."

25  (Respondents' Exh. GG at 2)   The record supports this finding because, at the sentencing

26  hearing, Judge Ishikawa found two additional aggravating factors - the presence of

27  accomplices and the emotional and physical pain to the victim- and did not find any

28  mitigating factors.  (Respondents' Exh. W, Tr. 6/17/05 at 50)

**F.  Ground IV(A)**

In Ground IV(A), Petitioner argues that the "firmly convinced" language in the trial court's reasonable-doubt instruction, given pursuant to the Arizona Supreme Court's directive in *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), violated the Fourteenth Amendment by lowering the State's burden of proof.  (Doc. 1 at 8)   The jury instruction at issue provides that:

> The state has the burden proving the defendant guilty beyond a reasonable doubt.  In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable.  In criminal cases, such as this, the state's proof must be more powerful than that.  It must be beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.  There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt.
>
> If, based on your consideration of the evidence, you are *firmly convinced* that the defendant is guilty of the crime charged, you must find the defendant guilty.  If on the other hand, you think there is a *real possibility* that the defendant is not guilty, you must give him the benefit of the doubt and find the defendant not guilty.

(Respondents' Exh. A, Item 142, pp. 4-5; Exh. S, Tr. 5/10/05 at 7-8) (emphasis added)

On direct review, the Arizona Court of Appeals rejected Petitioner's challenge to the reasonable-doubt instruction stating that:

> [Petitioner] claims that the trial court erred by overruling his objection to the reasonable-doubt instruction set forth in *State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995), because it impermissibly lowers the State's burden of proof and violates his constitutional rights.  The Arizona Supreme Court has continued to uphold the constitutionality of that instruction.  *State v. Roseberry*, 210 Ariz. 360, 369-70, 111 P.3d 4-2, 411-12, *cert. denied*, 126 S.Ct. 444 (2005).  We find no error.

(Respondents' Exh. Z at 20-21)

Petitioner has not shown that the Arizona Court of Appeals' rejection of his challenge to the reasonable-doubt instruction was contrary to, or an unreasonable application of, clearly established federal law.

The reasonable-doubt instruction given in this case correctly states the law.  Although the Supreme Court has not specifically addressed the reasonable-doubt instruction given in

this case, in a concurring opinion in *Victor v. Nebraska*, 511 U.S. 1, 27 (1994), Justice

Ginsburg approved an identically-worded federal pattern criminal jury instruction on

reasonable doubt:

> *See* Federal Judicial Center, Pattern Criminal Jury Instructions 17-18 (Instruction 21) (1987).  We agree with Justice Ginsburg that this instruction 'surpasses others . . .in stating the reasonable doubt standard succinctly and comprehensibly." *Victor*, 511 U.S. [at 27], 114 S.Ct. at 1253 (Ginsburg, J., concurring).  We believe that its consistent use will assist jurors, be fair to both the state and defendants, and obviate the need for any future appeals on this issue.

*Portillo*, 182 Ariz. at 596, 898 P.2d at 974.   Likewise, the Ninth Circuit has upheld the

reasonable-doubt instruction using the phrases "real possibility" and "firmly convinced."

*U.S. v. Artero*, 121 F.3d 1256, 1257-59 (9th Cir. 1997); *U.S. v. Velasquez*, 980 F.2d 1275,

1278 (9th Cir. 1992). In view of the foregoing, Petitioner is not entitled to relief on Ground

IV(A).

**IV. Conclusion**

For the reasons set forth above, the Petition for Writ of Habeas Corpus should be

denied because Petitioner's claims either lack merit or are procedurally barred.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus, doc.

1, be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave

to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the Petition is

justified by a plain procedural bar and jurists of reason would not find the procedural ruling

debatable and because Petitioner has not made a substantial showing of the denial of a

constitutional right.

This recommendation is not an order that is immediately appealable to the Ninth

Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

Appellate Procedure, should not be filed until entry of the District Court's judgment.  The

parties shall have (14) fourteen days from the date of service of a copy of this

recommendation within which to file specific written objections with the Court.  *See,* 28

U.S.C. § 636(b)(1); Rules 72, 6, Federal Rules of Civil Procedure.  Thereafter, the parties have (14) fourteen days within which to file a response to the objections.  Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any factual determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See*, Rule 72, Federal Rules of Civil Procedure.

DATED this 2nd day of May, 2011.

Lawrence O. Anderson
United States Magistrate Judge